**JOSEPH W. MURRAY, ESQ.**
185 Great Neck Road, Suite 461
Great Neck, New York 11021
T:   (646) 838-1702
F:   (646) 514-4771
C:   (718) 514-3855
E:   Joe@Jmurray-law.com



**ADMITTED TO PRACTICE**
New York State
Eastern District of New York
Southern District of New York

JMURRAY-LAW.COM

June 9, 2023

<u>VIA: ECF</u>

The Honorable Joanna Seybert
United States District Court Judge
Eastern District of New York
100 Federal Plaza, Courtroom 840
Central Islip, New York 11722

     Re: <u>*U.S. v. George Anthony Devolder Santos*, 23-CR-197(JS)(AYS)</u>
       <u>Defendant's motion seeking review and modification of Magistrate Judge</u>
       <u>Shields' order of release pursuant to 18 U.S.C. 3145(a)(2)</u>

Dear Judge Seybert,

  Defendant respectfully moves pursuant to 18 U.S.C. 3145(a)(2) to seek review by the District Court of the Order of the Honorable Magistrate Judge, Anne Y. Shields, dated June 6, 2023, at Dkt. No. 22, granting the motions filed by the New York Times Company ("The Times") at Dkt. No. 13, and ABC News, et al., ("News Organizations") at Dkt. No. 14, seeking to unseal the identities of our suretors, the related papers, and proceedings. For the following reasons, Defendant requests that the Order be reversed and the motions denied in all respects.

  **I.**  **Background**

  The Honorable George Santos ("Rep. Santos") is a duly elected member of the 118th Congress, United States House of Representatives, representing New York's Third Congressional District, in Queens and Nassau Counties, within the Eastern District of New York. As early as December 28, 2022, ABC News reported that "[f]ederal prosecutors have started looking into public filings by congressman-elect George Santos, amid questions about the source of his wealth, sources familiar with the matter told ABC News."[1] Thereafter, on May 9, 2023, a thirteen-count indictment, consisting of various financial crimes, that occurred before Rep. Santos assumed office, and the arrest warrant, were filed under seal. *See* Dkt. Nos. 1 and 2. *Id*.

---

[1] Aaron Katersky, Luke Barr, and Soo Rin Kim, *Prosecutors looking at George Santos amid lies, questions about his wealth*, December 28, 2022, 9:28 PM, https://abcnews.go.com/Politics/prosecutors-george-santos-amid-lies-questions-wealth/story?id=95902176

1

On May 9, 2023, the government notified defense counsel of the indictment and arrest warrant and allowed Rep. Santos to voluntarily return home from Washington D.C., so that Rep. Santos could self-surrender to the Federal Bureau of Investigations ("FBI") on the following morning and then head back to the Capital to be present for Thursday's session. (*See* Declaration of Joseph W. Murray at Dkt. No. 17-1, par. 3). The government and defense counsel had also been negotiating suitable terms and conditions of release to present to the Court, including, among other things, a $500,000.00 unsecured appearance bond with three financially responsible co-signors, as suretors. *Id*.

Unfortunately, on May 9, 2023, shortly after the defense was notified of the indictment and arrest warrant, this information was apparently leaked to the Cable News Network ("CNN"), resulting in an immediate media frenzy. (*Id*. at par. 4). Also, at this time, defense counsel had been in the process of engaging our suretors and presenting their documentation and contact information to the government, in preparation for the arraignment on May 10, 2023. *Id*. As the media frenzy progressively got worse our suretors grew very fearful and concerned. *Id*. As of the morning of May 10, 2023, we only had two confirmed suretors, while our third suretor had a change of heart and backed out. *Id*.

On the morning of May 10, 2023, as the media began to amass outside of the Courthouse, I received a call from AUSA Harris who kindly offered the services of our FBI case agents to arrange for an alternative means for my client to enter the Courthouse. (*Id*. at par. 5). Ultimately, Rep. Santos was arraigned before Judge Shields on Wednesday, May 10, 2023, and the Court approved of our joint proposed conditions, including the $500,000.00 unsecured appearance bond, which my client signed before being released. (*Id*. at par. 6). Thereafter, when our suretors appeared in court, defense counsel moved to redact the names of the suertors and seal the proceedings. (*Id*. at par. 4). The government took no position, and the application was granted by Judge Shields.

## II.     The Motions to Unseal the Identity of the Suretors

The Times and News Organizations filed letter motions essentially seeking an order releasing the unredacted records identifying the bail suretors, and to unseal and make public the bond proceedings, which are under seal. The motions asserted essentially two legal theories justifying disclosure, (1) the common law right of access to judicial records, and (2) a qualified First Amendment right of access. *See* Dkt Nos. 13 and 14.

## III.    Defendant's Objection to Judge Shields' Decision[2]

The Defendant is largely in agreement with the legal standard and legal analysis applied by Judge Shields. In fact, I incorporate by reference herein the legal standard contained within the Order at Dkt. No. 22. That withstanding, Defendant strongly objects to the great weight afforded to the right of access of these judicial records, up against the countervailing factors at issue with the suretors.

---

[2] In that Judge Shield's decision is under seal to protect the identity of the suretors from being disclosed, while this matter is being reviewed by the Judge Seybert, the defendant will only cite to the legal basis of the decision.

Judge Shields' Order granted the motions on behalf of The Times and News Organizations by first determining that the documents revealing the identity of the Suretors are judicial in nature. (*See* Order at p. 4, Dkt No. 22). The Defendant concedes the judicial nature of the documents sought to be unsealed by the movants. In that the records being sought to be unsealed are judicial in nature, Judge Shields logically concluded that they "fall within the bounds of the common law presumption of access." *Id*. Once again, the Defendant concedes that these records fall under the common law presumptive right of access to judicial records. Judge Shields analysis then turned towards the determination of what weight to apply to the presumption of access of these judicial records. *Id*. Herein lies Defendant's primary objection to Judge Shields' legal analysis.

A. **Weight afforded to the presumption as to these bond records**

Judge Shields determined that substantial weight should be afforded to these judicial records. *Id*. In doing so, it is respectfully submitted, that Judge Shields misapprehended the proper factual analysis that should have been conducted. First, Judge Shield's identified concerns pointed out by members of the press that "there is speculation that the Bond was signed by lobbyists, donors or others seeking to exert influence." *Id*. Judge Shields further pointed out that "similar concerns are shared by members of the United States House of Representatives Committee on Ethics" while citing to defense exhibit at Dkt. No. 17.6. (Order at pp. 4-5, Dkt. No. 22). Here, it is important to note that the Defendant addressed this specific concern raised by the press, within paragraph 11 of the Declaration of Joseph W. Murray (Dkt. No. 17.1), which reads as follows. "Exhibits J and K are a May 16, 2023 letter from the House Ethics Committee and my letter in response. I include these two exhibits to address an issue raised by The Times about the impropriety of the suretors pursuant to House Rules." *Id*. Apparently, Judge Shields either reviewed Dkt. No. 17.6, without also reviewing Dkt. No. 17.7, or that Judge Shields simply misapprehended the significance of the combination of these two exhibits when read together.

Yes, Judge Shields is correct that "the Committee seeks to be advised of the identity of the Suretors to determine whether the posting of bond constitutes an improper gift to Defendant." (Order at p. 5, Dkt. No. 22). However, the Committee on Ethics also requested that Defendant "[i]nform the Committee of any exceptions to the Gift Rule (House Rule XXV, clause 5) that [he] believe[s] may apply to the sureties." (Dkt. No. 17.6, at par. 3). Turning to Defendant's response at Dkt. No. 17.7, consider the following taken from Defendant's response:

> That withstanding, and in the abundance of caution, and in keeping with Congressman Santos' full cooperation, I respectfully submit to you that upon my review of the Rules of the House of Representatives of the One-Hundred Eighteenth Congress, I firmly believe that Congressman Santos has conducted himself honorably, lawfully, and ethically in keeping with the good order and finest traditions of an honorable member of the United States House of Representatives, in the manner in which the suretors who cosigned the unsecured $500,000.00 appearance bond, under oath in court were engaged.

3

Although I am unable to reveal the identity of the suretors, due to the Court sealing the proceedings, I direct your attention to Rules of the House of Representatives, 118th Cong., Rule XXV, cl. 5(a)(2)(A)(2023),which defines "gift" as "a gratuity, favor, discount, entertainment, hospitality, loan, forbearance, or other item having monetary value. The term includes gifts of services, training, transportation, lodging, and meals, whether provided in kind, by purchase of a ticket, payment in advance, or reimbursement after the expense has been incurred." Under this definition the surety co-signor of an unsecured appearance bond may be considered a "favor" or "other item having monetary value." *Id*.

Turning to Rule XXV, cl. 5(a)(3)(C)(2023) which provides that "[t]he restrictions in subparagraph (1) do not apply to the following: [...] "[a] gift from a relative as described in section 109(16) of title I of the Ethics in Government Act of 1978 (5 U.S.C. App. 109(16))." *Id*. Finally, the term "relative" is defined in section 109(16) of title I of the Ethics in Government Act of 1978 (5 U.S.C. App. 109(16)) as "relative' means an individual who is related to the reporting individual, as father, mother, son, daughter, brother, sister, uncle, aunt, great aunt, great uncle, first cousin, nephew, niece, husband, wife, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half brother, half sister, or who is the grandfather or grandmother of the spouse of the reporting individual, and shall be deemed to include the fiance or fiancee of the reporting individual." *Id*.

While it would have been improper to reveal the identities of the sureties to the Committee on Ethics, Defendant's counsel believed that it was ethical and proper to directly respond to the Committee's request that Defendant "[i]nform the Committee of any exceptions to the Gift Rule (House Rule XXV, clause 5) that [he] believe[s] may apply to the sureties." (Dkt. No. 17.6, at par. 3). In doing so, within Defendant's response to the Committee on Ethics, which was publicly filed as an exhibit (Dkt. No. 17.7) to the Declaration of Joseph W. Murray, sworn under penalty of perjury, Defendant has essentially publicly revealed that the suretors are family members and not lobbyists, donors or others seeking to exert influence over the Defendant. Contrary to Judge Shield's assertion that, [t]here is no way to quell such speculation and foster confidence in the judicial process but to reveal the identities of the Suretors" (Order at p. 5, Dkt. No. 22), the Defendant offers up a more palatable remedy that satisfies the interests of both sides. As this Court, the public, and the press can plainly see from Dkt. No. 17.7, that family members are exempt from the prohibitions on gifts to members of Congress. To the extent that it may be possible to unredact a portion of the sealed judicial bond records or proceedings to reveal the existence of a "family" relationship between Defendant and suretors without identifying the name or type of family member, Defendant would have no objection.

4

The weight of the presumption pertaining to bond records and proceedings, should be further diminished by additional factors. First, "the accused is shielded by the presumption of innocence…" *Betterman v. Montana*, 578 U.S. 437, 442 (2016), *quoting*, *Reed v. Ross*, 468 U.S. 1, 4 (1984). Moreover, "in our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 751 (1987). It logically follows that where pretrial release is common and the norm, the right of access to bail/bond records and proceedings is less weighty than in the rare exception where detention is ordered.

### B.     The weight afforded to countervailing factors

After establishing the weight of the presumption Judge Shields then considered the weight of only one countervailing factor, the "privacy interests of those risking disclosure." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006)(Order at p. 5, Dkt. No. 22). It is respectfully submitted that the court failed to perceive the importance of the privacy issues of these suretors, as well as other factors contributing to the weight against disclosure.

As indicated within Defendant's initial response at Dkt. No. 17, this case has quickly become what the Second Circuit describes as a "heater case". *Fiedman v. Rehal*, 618 F.3d 142, 157-158 (2d Cir 2010). The Court explained that "this was a 'heater case' –the type of 'high profile case' in which tremendous emotion is generated by the public." *Friedman v Rehal*, 618 F3d 142, 158 (2d Cir 2010); *quoting*, Susan Bandes, *The Lessons of Capturing the Friedmans: Moral Panic, Institutional Denial and Due Process,* 3 Law Culture & Human. 293, 310 (2007) (noting that the accusations against Arnold and Jesse Friedman arose at "a time at which concern about day care sexual abuse had reached a fever pitch both in the United States and abroad"). The Second Circuit continued to explain that "[i]n heater cases, the criminal process often fails: Emotions like fear, outrage, anger and disgust, in situations like these, are entirely human. The question is what the legal system can do to correct for the excesses to which they lead. The crux of the moral panic dynamic is that the legal system, in such cases, does not correct for them. It gets swept up in them instead. *Fiedman,* at 158, *quoting*, *Bandes* at 312.

Defendant made several relevant factual points about the media frenzy and hateful attacks that Defendant, his staff and even your undersigned have been subjected to. See Dkt. Nos. 17.1-17.5. These attacks have been extremely angry, anti-gay, anti-Republican and all around anti-social. *Id*. Moreover, even the government recognizes the unique and potentially dangerous/harassing environment that Defendant has been subjected to in that the government was so kind to offer assistance for Defendant entering the courthouse on May 10, 2023, by avoiding the mass of media that had appeared at the courthouse. *Id*. It is reasonable to conclude that if Defendant's suretors are identified, that the attacks and harassment will commence against them too. Moreover, given the political temperature in this Country and acts of political violence that occur, the privacy interests of these suretors are far more concerning, especially considering their ages and respective employment.

Further, that soon after the apparent leak from the Department of Justice about the impending arrest of Defendant on the indictment to someone at the Cable News Network ("CNN"), caused an immediate media frenzy just as defense counsel was attempting to engage the agreed upon three financially responsible suretors. The resulting media frenzy, greatly

contributed to our third prospective suretor having a change of heart and withdrawing. There is great concern for the health, safety, and well-being of our two suretors, which sadly, was not shared by Judge Shields, at least as a factor of their privacy concerns.

C. **The danger of impairing law enforcement or judicial efficiency**

Another countervailing factor to strongly consider is "the danger of impairing law enforcement or judicial efficiency." *Lugosch v Pyramid Co. of Onondaga*, 435 F3d 110, 120 (2d Cir 2006). As Judge Shields appropriately discussed, "[a]s is common in cases where there is neither property nor cash offered to secure a bond, the Court considered whether the Suretors were truly willing to stand up and make themselves responsible for Defendant's compliance with the terms of his release. The Court also inquired about their ties to this District and employment. Having made such inquiry, the Court was satisfied that the Suretors had discussed this matter with the Defendant, and that they maintained sufficient personal contact with him to make themselves aware of his conduct." (Dkt. No. 22, at p. 4).This was obviously because sueretors perform a vital law enforcement and judicial function in that the suretors are, in essence, the first line of enforcement and/or monitoring of the Defendant's conduct, location, and compliance with the conditions of Defendant's release. In fact, such admonitions may have been made by Judge Shields to the suretors. Obviously, given the media frenzy and resulting harassment, that will almost certainly come if the identities of the suretors are released to the public, this will inhibit the suretors from being able to do their job.

D. **Defendant's Eighth Amendment right**

Lastly, and briefly, Defendant is protected under the Eighth Amendment against "excessive bail." U.S. Const. amend. VIII. This does not mean that Defendant has an absolute right to be released on bail following an arrest. *United States v. Salerno*, 481 U.S. 739, 749 (1987). In the aftermath of the initial media frenzy that resulted after the apparent leak to CNN, one of Defendant's suretors withdrew. It is very likely that if the suretor's identities are released, that Defendant and the suretors will mutually decide that they shall have to withdraw from, serving as suretors. In that Defendant may be subject to more onerous conditions of release or may be subject to pretrial detention, presents as a potential countervailing factor to consider up against either the common law right of access to judicial records or the qualified First Amendment right to access.

Wherefore, Defendant respectfully requests this Court to review the prior Order of Judge Shields, *de novo*, and deny the motions to unseal by these various media companies:
a. To the extent that it may be possible to unredact a portion of the sealed judicial bond records or proceedings to reveal the existence of a "family" relationship between Defendant and the suretors without identifying the name or type of family member, Defendant would have no objection.

Respectfully,

Joseph W. Murray, Esq.

Cc: All parties via ECF