

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Jeremy A. Chase**
jeremychase@dwt.com

**Alexandra Settelmayer**
alexandrasettelmayer@dwt.com

212-489-8230 tel.
212-489-8340 fax

June 12, 2023

**VIA EMAIL**

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:     **Unsealing Request in *U.S. v. George Anthony Devolder Santos*, 2:23-cr-00197-JS-AYS**

Dear Judge Seybert:

      This firm writes on behalf of a coalition of news organizations, including, American Broadcasting Companies, Inc., d/b/a ABC News, The Associated Press, The Atlantic Monthly Group LLC (publisher of *The Atlantic*), Bloomberg L.P, Cable News Network, Inc., Insider, Inc., National Public Radio, Inc., NBCUniversal News Group, The New York Times Company, Newsday LLC, and WP Company LLC (publisher of *The Washington Post*) (collectively, the "News Organizations") to briefly address the Letter Motion of Defendant George Santos (Dkt. No. 23) seeking review and modification pursuant to 18 U.S.C. § 3145(a)(2) of Magistrate Judge Shields' June 6, 2023 Decision and Order granting the News Organizations' motions to unseal the identities of the sureties who signed the Appearance Bond for Defendant's pretrial release (the "Order"). Dkt. 22.

      By way of background, the News Organizations filed two letter motions with the Court seeking the release of unredacted versions of the Appearance Bond in the above-captioned matter (the "Unsealing Requests").[1] The Unsealing Requests sought access only to the names of the bail sureties and the amount that they guaranteed to secure Defendant's bail bond.[2] On June 5, 2023, Defendant filed his opposition to the Unsealing Requests (Dkt. 17). The following day Magistrate Judge Shields issued a sealed Order granting the Unsealing Requests. Dk. No. 22. Magistrate Judge Shields gave Defendant until noon on June 9, 2023 to appeal her Order. Defendant now appeals the Order through his Letter Motion.

      Initially, the News Organizations note that without access to Magistrate Judge Shields' sealed Order, they are limited in their ability to provide a fulsome response to Defendant's Letter Motion. Accordingly, should the Court require a more detailed response, the News Organizations

---

[1] The New York Times Company submitted a separate Letter Motion to unseal below (Dkt. 13) from the remaining News Organizations (Dkt. 14), but now joins the other listed News Organizations in this letter.
[2] Any personal information, such as addresses or telephone numbers, was not sought by the Unsealing Requests.

Hon. Joanna Seybert
June 12, 2023
Page 2

respectfully request that the Court first release Magistrate Judge Shields' Order with whatever limited redactions the Court deems necessary during the pendency of this appeal.

But even without the benefit of Magistrate Judge Shields' reasoning, Defendant's Letter Motion makes clear that the continued sealing of the sureties' identities is wholly unwarranted. As Defendant concedes that the records containing the identities of the sureties are judicial documents subject to the common law presumption of access, the only issues before this Court are (1) the weight to be afforded the common law presumption of access and (2) whether that presumption of access has been overcome. Defendant's arguments in favor of sealing fail.

Initially, the presumption of access here is strong as explained in the News Organizations' Unsealing Requests. *See* Dkt. 13, at 3; Dkt. 14, at 3-4; *see also* Dkt. 22. Indeed, there can be no question that "the value [of knowing the identities of the sureties] to those monitoring the federal courts" is immeasurable given Defendant's status as a sitting member of the U.S. House of Representatives charged with defrauding members of the public while campaigning for office. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). As Defendant's own submission makes clear, the identities of Defendant's sureties is a question of national significance that goes to the very integrity of our governmental institutions. *See* Dkt. 17-6 (Letter from U.S. House of Representatives Committee on Ethics to Hon. George Santos). Further, Defendant all but concedes that the identities of the sureties played a meaningful "role . . . in the exercise of Article III judicial power" (*Lugosch*, 435 F.3d at 119) by virtue of his admission that the sureties "appeared in court" for a hearing before Magistrate Judge Shields to assess their viability as sureties. Dkt. No. 23, at 2.[3] As such, the presumption of access to these records is strong.[4]

The competing considerations that Defendant identifies are simply insufficient to overcome the strong presumption of access here. *First*, "while the privacy interests of innocent third parties are entitled to significant weight, judicial documents entitled to a strong presumption of public access must remain public 'absent the most compelling reasons.'" *United States v. Basciano,* 2010 WL 11679716, at *3 (E.D.N.Y. May 12, 2010) (citing *Lugosch*, 435 F.3d at 123). Defendant has failed to offer any such compelling reason, beyond mere speculation. The "hateful attacks" directed at Defendant do not establish that the sureties would be subject to the same sort of communications. Moreover, "[s]hielding third parties from unwanted attention arising from an issue that is already public knowledge is not a sufficiently compelling reason to justify withholding judicial documents from public scrutiny." *Basciano,* 2010 WL 11679716, at *4; *see also Lytle v. JPMorgan Chase,* 810 F. Supp. 2d 616, 626 (S.D.N.Y. 2011). Further, irrespective of whether the sureties are members of Defendant's family, as he suggests to the Court, family members serve as

---

[3] *See also* Dkt. 23, at 6 ("[T]he Court considered whether the sureties were truly willing to stand up and make themselves responsible for Defendant's compliance with the terms of his release. The Court also inquired about their ties to this District and employment. Having made such inquiry, the Court was satisfied that the sureties had discussed this matter with the Defendant, and that they maintained sufficient personal contact with him to make themselves aware of his conduct.") (citing Dkt. 22, at 4).

[4] Defendant's suggestion that the sureties are members of his family in no way diminishes the presumption of access here. The identities of bail sureties, whether family members or not, are routinely released. *See*, *e.g.*, *United States v. Basciano*, 2010 WL 11679716, at *3 (E.D.N.Y. May 12, 2010) ("For documents like the sureties' individual bonds that "are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal.").

Hon. Joanna Seybert
June 12, 2023
Page 3

sureties for criminal defendants on a regular basis in this country, and public disclosure of their identities does not necessarily—and should not here—subject them to opprobrium.

While this case is no doubt one that has generated significant public interest, Defendant's attempt to classify it as a "heater case" by likening it to one of the most notorious child sex abuse cases in the last half century misses the mark. *See* Dkt. 23, at 5 (citing *Friedman v. Rehal*, 618 F.3d 142, 157-158 (2d Cir 2010)). The Second Circuit's discussion in *Friedman* related to "moral panics" inherent in high-profile emotionally charged cases that cause the criminal process to fail. While Defendant is accused of serious financial crimes and is a high profile public official, there is no moral panic underlying this case like there was in the child sex abuse case against Arnold and Jesse Friedman. But even if there was such a moral panic, it would be completely irrelevant to the release of the sureties' identities. Put differently, public knowledge of who is vouching for the Defendant will not result in the criminal justice system failing.

*Second*, Defendant suggests that law enforcement or judicial efficiency would be impaired by releasing the identities of the sureties, because the enhanced media scrutiny would inhibit the sureties' ability to perform their job of monitoring Defendant's conduct, location, and compliance with the conditions of release. Dkt. 23, at 6. Initially, these are not the sort of "law enforcement or judicial efficiency" concerns contemplated by the case law. *See*, *e.g.*, *U.S. v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (holding that law enforcement and judicial efficiency concerns are raised where a witness may be deterred from future cooperation within the legal system by the release of information). And while Defendant's suggested inability to comply with the conditions of his pre-trial release may be reason to deny or revoke his bail, it is no basis for denying public access to the identities of the individuals who are "truly willing to stand up and make themselves responsible for Defendant's compliance with the terms of his release." *Id.* (quoting Dkt. 22, at 4). Put simply, one has nothing to do with the other.

*Last*, Defendant makes a baseless claim that his voluntary decision to have his sureties withdraw from service would violate his Eighth Amendment right against "excessive bail." Defendant may choose to forego pre-trial release in lieu of revealing the identities of his sureties, but the Eighth Amendment has no bearing on his personal decision-making or, with all due respect, the public and the media's First Amendment rights.

We thank the Court for its consideration of this matter and renew our request for the prompt release of the identities of Defendant's sureties.

                                                          Respectfully submitted,

                                                          Davis Wright Tremaine LLP

                                                          Jeremy A. Chase
                                                          Alexandra Settelmayer

cc:      Attorneys of Record (via ECF)