```
                                                                    1

 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - -     X
 3
     UNITED STATES OF AMERICA,    :   21-CR-550(DC)
 4
          -against-               :   United States Courthouse
 5                                    Brooklyn, New York
     ERIC GOLDSTEIN, et al.,      :
 6                                    May 22, 2023
               Defendants.        :   3:00 o'clock p.m.
 7
      - - - - - - - - - - - -     X
 8
                    TRANSCRIPT OF ORAL ARGUMENT
 9              BEFORE THE HONORABLE DENNY CHIN
                 UNITED STATES CIRCUIT JUDGE.
10   APPEARANCES:

11   For the Government:          BREON PEACE
                                  United States Attorney
12                                BY: ROBERT POLEMENI
                                      ANDREW GRUBIN
13                                    LAURA A. ZUCKERWISE
                                      KAITLYN McTAGUE
14                                Assistant United States Attorneys
                                  271 Cadman Plaza East
15                                Brooklyn, New York

16   For Defendant Goldstein:    KANNAN SUNDARAM, ESQ.
                                  NEIL P. KELLY, ESQ.
17
     For Defendant Iler:          MICHAEL P. KELLY, ESQ.
18                                KATHLEEN HUNTER SHANNON, ESQ.
                                  ELPITHA LAMBROS, ESQ.
19
     For Defendant Turley:        AITAN D. GOELMAN, ESQ.
20                                LEILA BIJAN, ESQ.

21   For Defendant Twomey:        AMY M. SAHARIA, ESQ.
                                  PATRICK LOOBY, ESQ.
22                                TOBIN ROMERO, ESQ.
                                  ZACHARY K. WARREN, ESQ.
23
     Court Reporter:              Charleane M. Heading
24                                225 Cadman Plaza East, Brooklyn,NY

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

2

1          THE CLERK:  Criminal cause for oral argument on

2   United States versus Goldstein, docket number 21-CR-550.

3          May I have the appearances for the government,

4   please.

5          MR. POLEMENI:  Good afternoon, Your Honor.  Robert

6   Polemeni, Laura Zuckerwise, Andrew Grubin and Kaitlin McTague

7   for the United States.

8          THE COURT:  Good afternoon.

9          MS. ZUCKERWISE:  Good afternoon, Your Honor.

10         MR. GRUBIN:  Good afternoon, Your Honor.

11         MS. McTAGUE:  Good afternoon, Your Honor.

12         THE CLERK:  For the Defendant Goldstein?

13         MR. SUNDARAM:  Kannan Sundaram and Neil Kelly,

14   Federal Defenders of New York.  Good afternoon.

15         THE COURT:  Yes.  And just state if your client is

16   present and if not, that the appearance is waived.

17         MR. SUNDARAM:  So my client is not present.  He's

18   actually ill today so his appearance is waived.

19         THE COURT:  Okay.

20         THE CLERK:  Michael Kelly, Kathleen Shannon and

21   Elpitha Lambros from Akerman on behalf of Blaine Iler and

22   Mr. Iler is with us here today.

23         THE COURT:  Good afternoon.

24         THE CLERK:  For the Defendant Turley?

25         MR. GOELMAN:  Good afternoon, Your Honor.  Aitan

3

1   Goelman and Leila Bijan for Michael Iler who is not here and

2   waives his presence.

3            THE COURT:  All right.

4            THE CLERK:  For the Defendant Twomey?

5            MS. SAHARIA:  Good afternoon, Your Honor.  Amy

6   Saharia and with me is Zach Warren, Patrick Looby and Tobin

7   Romero for Mr. Twomey and Mr. Twomey is not present and waives

8   his appearance.

9            THE COURT:  Good afternoon.

10           THE CLERK:  Thank you very much.  Please be seated.

11           THE COURT:  Did you introduce yourself?

12           MR. GOELMAN:  I introduced her, Your Honor.  This is

13  Leila Bijan.

14           THE COURT:  I see.  Okay.

15           We have motions in limine, motions to quash.  This

16  is far more litigation than I have seen, I can't remember

17  there being so much before, right as we are about to start a

18  trial.  I'm not sure what the reason for that is.  I think

19  there were three filings today.  I think there was a filing an

20  hour ago.

21           I was at the Fordham Law School graduation.  I have

22  not had a chance to read the additional filings.  I won't be

23  able to rule on everything today.  We don't have responses to

24  everything so we'll go through.  I'm going to rule on as much

25  of this as I can and then we'll have to figure out when I can

4

1   deal with the other things.

2        Are there any preliminary matters that anyone wants

3   to address?  Otherwise, I'll run through these motions as best

4   as I can.

5        No?  Okay.  Well, let me do this.  And there were

6   filings over the weekend as well.

7        The defendants' motion for more time for opening

8   statements, one of the problems is that when I first asked

9   this question last week, the response was an hour per

10  defendant which would be four hours of openings when the

11  government said that it was asking for 30 minutes and probably

12  would only take 20.  It just seemed such a disparity and

13  unlike, frankly, any criminal trial I've done where opening

14  statements would be so long.  I understand there are four

15  defendants, but the government has got to cover four

16  defendants in its opening statement as well.

17       In any event, that said, I will allow 20 minutes per

18  defendant for a total of 80 minutes.  If the defendants want

19  to whack it up a little differently, that's fine, but there

20  will be a total of 80 minutes.  If you can't agree, then

21  20 minutes per defendant, and that's the best I'm going to do.

22       Let me proceed to the government's 404(b) motion

23  which is docket number 88.

24       The government moves to admit either as direct

25  evidence Mr. Goldstein's corrupt intent or under Rule 404(b),

1   to show knowledge and awareness of his obligations.  There

2   were three items:  Failure to disclose to the DOE and the

3   conflict of interest board its ownership interest in RMSCO;

4   two, that he regularly communicated with the DOE Ethics

5   Office; and, three, that in March of 2017, he obtained a loan

6   and instructed the lender to pay the proceeds to RMSCO rather

7   than to Goldstein, rather than to him personally, and some

8   statements along those lines.

9          Relatedly, something came in regarding experts as

10  well which involved the issue of whether there's expert

11  testimony on the issue of complying with the rules.

12          Anyone want to add anything to the papers?

13          MR. GRUBIN:  Your Honor, I'm happy to I guess have

14  to take the opportunity to respond.  I can try and cover both

15  404(b) and then also, I guess, the expert issue.  I did see

16  the filing over the weekend.  We didn't respond but I think I

17  can orally if that's all right with Your Honor.

18          THE COURT:  That's fine.

19          MR. GRUBIN:  So as an initial matter, just for

20  starters, the defense knows well who Samantha Biletsky is.

21  They've had her e-mail communications, between her and

22  Goldstein in discovery for over a year now.  In addition, they

23  likewise know, they've also had the COIB conflict of interest

24  forms.

25          THE COURT:  Is the government intending on calling

6

1   her as an expert?

2        MR. GRUBIN:  No, and I'm happy to get to that in a

3   minute, Your Honor.

4        THE COURT:  Okay.

5        MR. GRUBIN:  The answer is no, Your Honor, and I'll

6   speak more about that.

7        They've also known that in some form, this conflict

8   issue was going to come up all along.  It's basically, it's

9   just --

10        THE COURT:  The witness would say what the rules

11   were and that --

12        MR. GRUBIN:  She's going to --

13        THE COURT:  -- Mr. Goldstein did not comply?

14        MR. GRUBIN:  Basically, what she's going to say or

15   what we expect her to say is her interactions with Goldstein,

16   mostly in the form of e-mails about his obligations, getting

17   waivers for certain conflicts, Goldstein getting approval for

18   travel, Goldstein seeking advice on payments by outside

19   vendors, and she's also going to testify I expect that

20   Goldstein never asked her or sought a waiver for all things

21   relating to SOMMA, RMSCO, no travel approval for all things

22   SOMMA.  These are independently established facts -- at trial,

23   they're obviously going to be independently established facts

24   at trial and, yes, a response to what would you have said had

25   he sought a waiver for that.

7

1          This is not -- these are, and I'm happy -- I guess
2     I'll move quickly into the expert portion and then come back
3     to 404(b) if that's all right, Your Honor.
4          THE COURT:  That's fine.
5          MR. GRUBIN:  So on the expert component, again,
6     she's going to be testifying for the most part on her personal
7     knowledge.  She will say, I expect -- you know, I expect she
8     will say it's a very straightforward rule which is Government
9     Exhibit 45, a two page sheet that lists the rules that
10    Goldstein would have received and did receive as a public
11    official at the DOE.
12         It says things like, I mean this is, the rule is --
13    you know, the rules are things like, that -- sorry.  I want to
14    get the exact language from the form.  It's, you know, it says
15    that public servants -- things like public servants need
16    waivers if they're going to do business with the City or, you
17    know, public servants may not use their City positions to
18    benefit, and I'll find the exact language shortly, but any
19    person or firm with whom they have a business or financial
20    relationship.
21         She's been there for 15 years.  These are things
22    that are well within the ken of, like, what the jury can
23    understand.  These are not complicated.  This is very
24    straightforward stuff.
25         The reason, by the way, why this is relevant is not

8

1   because he was -- and this goes to the 404(b) too, Your Honor.

2   The reason we're introducing this is not because of some sort

3   of, to prove up that he violated his conflict of interest,

4   conflict of interest laws and, therefore, is guilty of a

5   bribery scheme.  The reason is because the defendants

6   including Goldstein are charged with honest services wire

7   fraud and an element of that charge is that Goldstein

8   knowingly participated in a fraud, in a scheme to defraud the

9   DOE by means of false pretenses or representations.  That is

10  deception.  And deceitful statements include half truths or

11  concealments of facts.  I believe that's both, in both jury

12  charges, at least it's in the government's.

13          While it's certainly not required, it's also

14  certainly relevant to that material omission that Goldstein

15  was well aware of certain conflicts and disclosures and things

16  of this sort that he had to make do and he did not do so and

17  also, for that matter, it's relevant under 666, Federal

18  Program Bribery, because the defense appears to intend to

19  argue, again, from their voir dire and from the jury

20  instructions which say things like, you know, it's totally

21  fine that the defendant had this business with these outside

22  vendors which is, by the way, you know, I think that should be

23  precluded and we can talk about that later because it's, of

24  course, not, you know -- putting that aside, it appears

25  they're going to tend to argue that these are all bona fide

9

 1   transactions and you don't conceal bona fide transactions.  So

 2   this stuff is direct, these things are direct evidence.

 3            Again, I apologize.  I've jumped a little bit

 4   between had 404(b) and expert, but I think they overlap and

 5   I'm happy to continue and talk a little bit more.

 6            THE COURT:  I'm happy to hear from defense.

 7            MR. GRUBIN:  Thank you.

 8            THE COURT:  Let me hear from defense counsel.

 9            MR. LOOBY:  Your Honor, Patrick Looby on behalf of

10   Brian Twomey and I will be speaking to the expert portion and

11   I understand that counsel for Mr. Goldstein will be speaking

12   to the 404(b) opposition.

13            THE COURT:  All right.

14            MR. LOOBY:  On the expert piece, the testimony that

15   the government has disclosed for the first time in their

16   opposition to defendant's motions in limine falls into four

17   categories:  One of which, and I'm quoting from their brief,

18   is their personal knowledge of Mr. Goldstein's disclosure or

19   lack of disclosure to the DOE and the conflict of interest

20   board; two, their knowledge of the purpose and framework of

21   the DOE's and conflict of interest board's disclosure and

22   conflict of interest rules and regulations; three, whether

23   Mr. Goldstein complied with those rules and requirements; and,

24   four, how the witnesses would have responded to Goldstein if

25   he had made certain disclosures.

10

1          Category number one which is the first category that

2     counsel for the government addressed which is the witnesses'

3     personal interactions with Mr. Goldstein regarding, you know,

4     what they interacted with him with regards to travel and what

5     materials were made available to him.  That's not challenged

6     as expert in defense motion at ECF 113, but the other three

7     categories do cross the 702 line.

8          The government's primarily relying on the Second

9     Circuit's case in United States v. Cuti for the ability to ask

10    these witnesses hypothetical questions regarding, you know,

11    what they would have done if Mr. Goldstein had made certain

12    disclosures.  In defendant's motion, we explain, you know, the

13    various ways in which Cuti is not apposite here.  Here, we do

14    not have a limited hypothetical.  We have a very open-ended

15    hypothetical.  This is, you know, what advice would you have

16    given, would you have determined that whatever disclosure they

17    claim Mr. Goldstein should have made --

18          THE COURT:  Isn't it common when you have issues of

19    reliance, materiality, et cetera, to ask a witness what the

20    witness would have done or what would have happened if the

21    information had been complete or truthful?  I think it's a

22    common thing.

23          MR. LOOBY:  Well, it's common, Your Honor, mostly in

24    wire fraud cases where the materiality of a false statement

25    upon the recipient is being evaluated.  So the recipient would

1   testify, you know, if I had known fact X, I wouldn't have

2   wired them the money.  If I had known this, I wouldn't have

3   done that.  In <u>Cuti</u>, there was a separate but related concept

4   of, well, what would the company's financial statements have

5   looked like if you had known fact X which was independently

6   established.

7          Here, we don't have an allegation that Mr. Goldstein

8   ever consulted either of these witnesses in realtime regarding

9   these disclosures.  In fact, the government's allegation is

10   the opposite, it's that he concealed this information from

11   them.  So they have no contemporaneous percipient knowledge

12   that's relevant to the case.  So what they would be asking to

13   opine on is, you know, well, exactly what would you have done

14   and here, it's not clear what the relevance of that is other

15   than, I suppose, that the government is going to try to elicit

16   testimony that they would have told him that the, that he

17   would need a waiver or that his interest in RMSCO would have

18   violated the rules.

19          That leads me to the second point of both in <u>Cuti</u>

20   and in the Second Circuit cases of <u>Rega</u> and <u>Bank of China</u>, the

21   court has made very clear that lay opinion testimony crosses

22   the line when it applies the facts of the case to either rules

23   of professional conduct or regulations or laws and it crosses

24   that line and says, yes, you, in fact, you broke this rule.

25          That under any cases that we have cited in our brief

12

1    would be clearly expert and we don't have an expert disclosure

2    from these witnesses.  The government maintains that it's

3    patently obvious that Mr. Goldstein's interest in RMSCO would

4    have violated these rules, but we don't even know which rules

5    they claim that he violated.

6           We've attached to our motion the relevant rules.

7    They're spread across -- different bodies are promulgating

8    them.  There's different provisions.  None of the government's

9    disclosures, both the 302s that have been provided, have the

10   witnesses tied any of the facts of this case to a particular

11   regulation.  So we haven't been given the disclosure or the

12   opportunity to respond to that.

13          The first time that we've heard -- and the

14   government says that we knew the disclosure issues would begin

15   the case.  The very first time when they said that they would

16   ask somebody to opine on whether or not Mr. Goldstein's

17   conduct crossed the line and constituted a violation was in

18   their May 15th opposition to our motions in limine.  That's

19   two weeks ahead of trial.  It's too late.

20          THE COURT:  Okay.  Let me hear from, is it Mr.

21   Sundaram?

22          MR. N. KELLY:  Neil Kelly, Your Honor.

23          THE COURT:  Mr. Kelly.

24          MR. N. KELLY:  Thank you.

25          Briefly, on the 404(b) issue, I think the government

13

1   in its presentation conflated the same two issues that we've

2   pointed out in our written submission which is the fact of

3   whether Mr. Goldstein told witness X, Y or Z about his

4   interest in RMSCO and whether he had a legal obligation to

5   disclose that information under either the DOE rules or the

6   COIB rules or some of the, the regulations that counsel for

7   Mr. Twomey just identified.  So I think it's important to

8   disentangle those because it affects what the analysis is

9   under rules 404(b) and 403.

10          On the 404(b) issue, as we wrote in our papers, it

11  sounds like the government reiterated today that it will be

12  proceeding on a theory that Mr. Goldstein engaged in

13  undisclosed self-dealing.

14          As the Supreme Court addressed in Skilling, that is

15  not within the ambit of honest services fraud as charged and

16  so we think that allowing that evidence and that argumentation

17  to go to the jury will inevitably lead to the 403 issue that

18  we disclosed or discussed which is a confusion of what is

19  actually being presented to the jury, what elements do they

20  actually need to decide to determine whether Mr. Goldstein

21  committed the charged offenses, and if they are going to be

22  distracted by this body of civil regulations, we're not only

23  going to have a trial within a trial about what those

24  regulations are, when did they apply to him, what did they

25  require, when did he need to disclose certain information, but

14

1   also the jury will then be tempted to convict him for

2   potentially violating civil regulations, not the criminal

3   statutes with which he's charged.  So we think that that's

4   both a 404(b) issue and a 403 issue.

5        I think the Second Circuit decision in Quattrone

6   actually goes to that issue pretty clearly which in that case,

7   there was an allegation of witness tampering and obstruction

8   of justice within the context of an SEC investigation.  There

9   was other evidence put in front of the jury that Mr. Quattrone

10  had not complied with other SEC requirements and disclosure

11  obligations.  The Second Circuit overturned the conviction of

12  that case.  That was one of the many reasons, but what the

13  court said was that that evidence of violations of potential

14  civil regulations tempted the jury, even though it was

15  probative in that case, that it tempted the jury to convict

16  Mr. Quattrone on the improper basis, and we think that that's

17  exactly the case here as well.

18       So I think the government just needs to be clear

19  about what it is actually proposing to do because I think the

20  proposed evidence fails under both 404(b) and 403.

21       THE COURT:  Some of it, we're just going to need to

22  see what shakes out at trial.

23       Has there been an indication made of what rules

24  require disclosure?  Have you provided that?

25       MR. GRUBIN:  Yes.  I mean there are a couple of

1  things, Your Honor, just on the 404(b).

2          Again, there's Government Exhibit 45, but there are

3  two real Exhibits.  One is Government Exhibit 45 and, again,

4  these rules are not as complicated as I feel like the defense

5  is trying to make them sound.  It's fairly straightforward.

6  These are two -- public servants, you know, may not use their

7  City positions to benefit those whom they have a business or

8  financial relationship.

9          THE COURT:  So I don't have the exhibit in front of

10 me.  So Government's Exhibit 45 sets forth the rules and --

11          MR. GRUBIN:  Government Exhibit 45 --

12          THE COURT:  I'm trying to ask a question here.

13          It sets forth the rule and that's the rule that the

14 government contends he should have complied with?

15          MR. GRUBIN:  Yes.  Government Exhibit 45 is a

16 two-page fact sheet that Goldstein would have received when he

17 filled, that he received when he filled out his financial

18 disclosure forms.

19          Now, there is a -- as defense rightfully points out,

20 there, like, other -- there's City rules and City laws and

21 things about interest and other things.  We're not planning on

22 getting into any of that.  I think it is very self-explanatory

23 to a jury that, like, hey, and it's not self-dealing.  I mean,

24 yes, he was doing that too, but that's not what we're trying

25 to, that's not the point here.

16

1          The point is it is, of course, something he -- it

2    is, of course, an admission when you do not tell the DOE

3    ethics officer that you are engaged in a business, you are

4    making decisions about a business you have partnerships with.

5          THE COURT:  I heard enough.  We can't take this much

6    time on every application.

7          The government's motion to admit this evidence is

8    granted.  I'll allow it as 404(b) evidence.

9          I'm accepting the government's representation that

10   the rules in question are the very simple ones and not

11   anything complicated.  If the government at any point tries to

12   offer something more complicated, more complex, then

13   defendants are free to object.  I find that the evidence is

14   relevant.  It's probative of intent.  It's relevant to the

15   issues of deception and fraud and the probative value

16   outweighs the danger of unfair prejudice.

17         I think it's important to know -- the communications

18   with Ms. Biletsky, I think, are fine.  I mean she communicated

19   with Mr. Goldstein about a number of issues.  It seems to me

20   that's not expert testimony.  I mean there may be -- it comes

21   close to being expert testimony in terms of whether he

22   complied with the rules, but if we're talking about something

23   really simple, I don't see it as an issue.

24         If it becomes something more complex and it's a

25   complicated conflict of interest rule, then we'll cross that

17

1  bridge when we get there, but for the time being, the

2  government may proceed with this evidence, all three parts of

3  that motion.

4          Turning to the defendant's joint motion in limine,

5  Docket No. 96, there are four parts:  Testimony from or

6  regarding the DOE employee who choked, reportedly had choked;

7  photographic evidence of the foreign matter; any testimony

8  regarding the risk the incidents posed to children's safety;

9  testimony from witnesses about how the incidents made them

10 feel.

11         I'm inclined to deny the motion to exclude as to the

12 first three parts.  I'm inclined to grant the motion as to how

13 the witnesses felt.  I'm not sure what that means, but if the

14 defendants want to add anything, feel free.

15         MR. LOOBY:  Yes, Your Honor, very briefly.

16         The defendants submit that it's important to

17 evaluate these four pieces of evidence for their marginal

18 probative value above what will be undisputed and uncontested

19 at trial.

20         The government maintains it needs these four pieces

21 of evidence, including the testimony of the choking victim, to

22 provide context surrounding the final alleged quid pro quo,

23 the context being that the chicken tenders were on hold, that

24 the defendants had a motive to get them back on hold.

25         Those facts are not going to be disputed that the

1    tenders were on hold, that it was due to issues of bones and

2    foreign matter in the tenders.  This is really, Your Honor, a

3    question about what did these additional challenged pieces of

4    evidence add to that context.  Defendants submit that these

5    pieces do not add anything of marginal probative value, but

6    they do have a danger to inflame.  They have a danger to

7    distract the jury as well.

8              If the government is pursuing the argument that the

9    children or school children were at risk, the defendants put

10   them at risk and that the school children were the victims of

11   the harm, defendants intend to and will be forced to

12   vigorously contest that.

13             As we submitted in our motion, that is misleading.

14   Issues unfortunately arise in food products in the DOE

15   regularly, including the companies that are not new start-ups

16   like SOMMA.  To imply that the evidence regarding the issues

17   of tenders is probative evidence of whether or not there was

18   bribery in this case would be misleading and needs to be

19   contextualized with this other evidence.

20             Additionally, defendants conducted a thorough

21   investigation, the SOMMA defendants did, into the root cause

22   of the issue.  They submitted a corrective action to the DOE

23   and they ultimately tried the case in a Texas civil court

24   where the manufacturer and the two suppliers of the raw

25   material were found to be responsible.  This is all, should

19

1    not need to be contextualized to such a degree, but if the

2    jury is going to hear that the defendants put children at

3    risk, defendants will be forced to do that.

4           So we've heard and understood Your Honor's tentative

5    ruling, but we ask the Court to either reserve or to assess in

6    context these four pieces of evidence with their marginal

7    probative value in light of the evidence that will be

8    undisputed at trial.

9           THE COURT:  Well, I understand that the defendants

10   aren't challenging some parts of it, but it seems to me it's

11   important how bad things were.  The government is entitled to

12   show that that things were pretty bad.

13          Yes, of course, it's prejudicial if there is

14   evidence that children were endangered, but if indeed the

15   government's allegations are true, then perhaps they were in

16   danger.  It just seems to me that it is relevant, that the

17   probative value is high.

18          I'm happy to give -- I should have said this with

19   the first, the 404(b) motion as well.  I'm happy to give a

20   limiting instruction, I'm happy to give a limiting instruction

21   here, but it seems -- I mean I thought about this and it's

22   also, there's a counter-motion on the other side and it seems

23   to me the evidence should come in.

24          How witnesses felt, does the government want to

25   address that?  I don't see how that is terribly helpful.

1    MS. ZUCKERWISE:  No, Your Honor, no need, and the

2   government is happy to rest on its papers on this argument and

3   has no objection to a limiting instruction.

4    THE COURT:  All right.  Yes.  Defendants can submit

5   a proposed limiting instruction.

6    So I'll grant the motion as to item four, part four,

7   how incidents, how witnesses felt as a consequence of the

8   incidents.

9    Defendants' motion number two:  Exclude evidence of

10   events that occurred after the charged conduct including 2017

11   allegations of foreign matter in SOMMA's chicken tenders, the

12   2017 loan and evidence of how Goldstein spent funds received

13   as part of the scheme.

14    I'm inclined to allow the evidence of the 2017

15   allegations to permit the government to complete the story.  I

16   think the events of 2017 are relevant.

17    This was also raised in another issue.  I don't see

18   how Mr. Goldstein's divorce or spending monies on his divorce

19   is relevant and it could be prejudicial.  I don't see how

20   communications between the lawyers as they're trying to

21   resolve that case would be relevant or admissible.

22    I think the government is entitled to show that the

23   funds were used for personal reasons, personal purposes.  I

24   understand that some of it was used to pay RMS's lawyers but

25   not all of it and, you know, I think, I think it is relevant.

1          The finding of more foreign matter in 2017, I think,

2    is also relevant.  I mean SOMMA had been permitted to continue

3    selling and look at what happened.  I think it comes in.  I

4    think the probative value outweighs the danger of unfair

5    prejudice.

6          That's where I'm at on that.  Does anybody want to

7    add anything?

8          MR. GRUBIN:  Just very briefly, Your Honor.

9          The government hasn't or at least I haven't had a

10   chance to look yet at the divorce motion that I think was

11   filed this morning.  The only, my only response generally

12   would be there might be very specific statements by the

13   defendant in it that could be pertinent.

14         I think, for example, saying things like, I have --

15   and this could be -- I don't have it in front of me but I

16   think he makes references about SOMMA, about RMSCO that might

17   be relevant.  I think we would have to be very careful to work

18   with the defense to almost redact everything else.  I think

19   there's also a statement about -- it's also later when we're

20   talking about motive or Goldstein talks about being strapped

21   for money, strapped for cash.  There might be -- and it puts

22   it in context.

23         Again, I think we would have to be careful about it

24   and I'm happy to read what the defense submitted and see if we

25   can work something out.

22

1    THE COURT:  Well, yes, I mean, I think, of course,

2  you should read what the defendant submitted, but my

3  inclination is that much of it is not relevant, not probative

4  and potentially prejudicial.  Apparently there are e-mails

5  about the children, et cetera.  I don't -- and also, it's the

6  lawyers talking apparently to try to resolve things.  I don't

7  see how that's relevant.

8        If there are specific statements that Mr. Goldstein

9  made as opposed to his lawyers that could be relevant, then

10  that's a different story and, yes, be careful, discuss it with

11  defense counsel and maybe you'll surprise me and agree on

12  something.

13    MR. GRUBIN:  Thank you, Judge.

14    THE COURT:  Okay.

15    Motion number three:  Exclude lay testimony on

16  whether a recall should have been issued regarding SOMMA's

17  chicken tenders.

18        I don't know that there's a real disagreement here.

19  I think the parties -- I don't think it's important whether

20  you call it a recall or not and so I don't know whether we

21  should fight about whether it's a recall or whether we should

22  have expert testimony on whether it's a recall.

23        So I would be inclined to grant that motion to the

24  extent that, you know, we're not going to take evidence on

25  whether it was a recall within the parameters.

1          MS. ZUCKERWISE:  Your Honor, may I be heard on this?

2          THE COURT:  Yes.

3          MS. ZUCKERWISE:  Just very briefly.  The government

4    has no intention to put in any evidence that would argue

5    whether or not it should have been a recall or reimbursement

6    or a hold, but there are some e-mails that say it was a recall

7    and those will come into evidence, I expect, because they will

8    be relevant to other matters.

9          So the issue will be raised but the government is

10   not going to attempt to prove up whether it properly was

11   called a recall or not.

12         THE COURT:  Yes, I mean there may be e-mails that

13   say the chicken tenders should have been recalled.  It's

14   almost using the word in its everyday meaning as opposed to

15   something technical but -- yes?

16         MR. LOOBY:  Yes, Your Honor, very briefly.

17         The government should not be permitted then, if this

18   is their position, to argue that or insinuate that the

19   classification that the DOE eventually took was in any way

20   connected to the allegations of bribery in this case.

21         Our concern with this evidence is that it's a, the

22   e-mails that reflect a dispute between a important government

23   witness and SOMMA regarding the classification of this

24   important event in the case and, ultimately, that witness'

25   view, which is legally incorrect which is, again, not

1    disputed, is not followed by the DOE.

2        What we are concerned about and want to avoid is

3    getting that lumped in as another instance in which the

4    government is alleging or implying or it's left to hang out

5    there before the jury that Mr. Goldstein had something to do

6    with that or is alleged to have when the government does not

7    even allege that.

8        So we would submit that testimony concerning this

9    topic and documents concerning this topic, the unfair

10   prejudice from injecting this incident into the case will

11   outweigh whatever minimal probative value which the government

12   hasn't articulated other than just to say that it's going to

13   be relevant to some other issue.

14       THE COURT:  Well, I mean I think what I'm saying is

15   we're not going to get into the issue of whether this was in

16   fact a recall within the meaning of the regulations or

17   protocols or whatever.

18       To the extent that these communications bear on the

19   other allegations, the bribery allegations, the fact that the

20   word "recall" is used does not disqualify that evidence from

21   coming in, but we want to be careful about it.  This is

22   another area where we can give a limiting instruction to the

23   jury and, you know, along the lines of there is no issue as to

24   whether there should have been a recall, I'm not sure how you

25   phrased it.  In other words, there could be some kind of

25

 1  instruction given as well if need be to address any concerns
 2  that the jury is going to be led astray by communications
 3  referring to recalls.
 4         MR. LOOBY:  Yes, Your Honor, and I suppose when and
 5  if these documents are offered by the government, we just
 6  assess whatever probative value they're able to articulate at
 7  that point against the 403 risk that we've identified in our
 8  motion.
 9         THE COURT:  Yes, I mean if something comes up in
10  context, you're free to make another objection.  What I'm
11  saying is that, in general, I don't have a problem with the
12  fact that communications used the word "recall" as long as
13  it's clear that whether there was, in fact, a recall is not an
14  issue in the case and the parties seem to agree that whether
15  it should have been classified as a recall is irrelevant and,
16  therefore, that should not be proven up and cannot be proven
17  up.
18         MR. LOOBY:  Thank you, Your Honor.
19         THE COURT:  Okay.
20         Motion number 4A, I'm not sure these are in the
21  right order:  Exclude witness testimony concerning
22  hypothetical events of what witnesses would have done or how
23  they felt had they known about Goldstein's interest in RMSCO.
24         I think I covered that already.  Is there something
25  different or is this the same?  This is what-if-you-had-known

1   questions.

2       MS. ZUCKERWISE:  That's correct, Your Honor.

3   Your Honor did cover it with respect to two potential

4   government witnesses, Ms. Biletsky and Ms. Miller.

5       There's one additional witness who might be asked

6   hypothetical question.  That's Jeff Richards who is an

7   investor in SOMMA.  For the same reasons, it's standard in

8   fraud cases, the defense acknowledged, to ask, to put

9   documents in front of a witness and say was this shown to you

10  and what would you have done differently if it had been.

11      THE COURT:  All right.  So it's covered by my prior

12  ruling.  Obviously, if something is pure speculation, then

13  there can be an objection made and I would likely sustain the

14  objection if it's pure speculation, but I think this is an

15  appropriate case for what-if-you-had-known questions about

16  facts that had been withheld.

17      If the witnesses had known about Mr. Goldstein's

18  relationship with other, the other defendants and, in

19  particular, his financial interest in the other entity, what

20  would they have done, I think those are appropriate.

21      Yes?

22      MR. LOOBY:  Yes, Your Honor, just very briefly.

23      On the application of the Cuti analysis to the SOMMA

24  investor, we submit that this testimony is even farther afield

25  from the limited hypothetical testimony that was permitted in

1    that case in which the accountants were talking about, well,

2    how would these facts have impacted your very technical, the

3    financial statements that you were preparing.

4        Here, I think this would open up the door for

5    speculation to somebody whose views as an investor is not

6    alleged to have been a victim of any of the crimes.  It's not

7    really clear exactly what the relevance of what he would have

8    done has to any of the government's allegations much and so.

9        THE COURT:  Let me hear again about the investor.

10   I'm not quite sure.

11       MS. ZUCKERWISE:  Sure, Your Honor.

12       In this case, there was a significant investor in

13   SOMMA who was not told that SOMMA owned a significant portion

14   of RMSCO.  He'll be shown documents, I anticipate, where it is

15   clear that SOMMA did own a significant portion of RMSCO.

16   He'll be asked if he had seen these before or if he knew about

17   them at the time or knew them at the time that SOMMA was an

18   owner of RMSCO.  Then he will, I suspect, be asked what he

19   would have done differently at the time if he had known about

20   it.

21       This is squarely under Cuti which says that --

22       THE COURT:  He would have said, what, he wouldn't

23   have invested?

24       MS. ZUCKERWISE:  Yes, he wouldn't have invested or

25   he would have walked away once he learned.

1          THE COURT:  And how does that show, how does that

2    prove up the bribery allegations?

3          MS. ZUCKERWISE:  Your Honor, it tends to show some

4    of the reasons for concealment, that everybody in the ambit of

5    the defendants knew that what was happening was unlawful, was

6    bribery, and there wouldn't have been legitimate investors.

7    It's relevant because the defense intends to argue, we

8    understand, that the entire RMSCO business was legitimate.

9    This is not a legitimate practice, concealing something like

10   this from your investor.

11         THE COURT:  Just --

12         MR. LOOBY:  Your Honor, very briefly.

13         There's no allegation of fraud against the SOMMA

14   investors and testimony along this line falls squarely within

15   the line of cases that we cite in our motion.

16         THE COURT:  The defendants are arguing this was all

17   a legitimate business and everything SOMMA did was on the up

18   and up?

19         MR. LOOBY:  That's right, Your Honor.  So his

20   interest in RMSCO was legitimate and we will argue that at

21   trial.

22         THE COURT:  I'll allow the evidence.  I'll allow the

23   evidence.  I'm not persuaded.  I think it's relevant.

24         Now, 4B:  Defendants move to exclude testimony that

25   aspects of the DOE-SOMMA relationship were strange, unusual or

29

1   made the witness uncomfortable.

2        My initial reaction was to allow some of this if the

3   dealings and the relationship were unusual, that these were

4   observations that would seem relevant, but then there's

5   another, there was a later motion regarding unusualness that

6   the government was, wanted to put in evidence that something

7   was -- I'm sorry.  I lost it now.  There was a later request

8   to allow, the government wanted to keep out evidence that

9   something was unusual.

10        Am I getting it wrong?

11        MS. ZUCKERWISE:  Well, Your Honor -- I'm sorry.

12        MS. SAHARIA:  I'm happy to address that, Your Honor.

13        THE COURT:  Yes.

14        MS. SAHARIA:  I think you're referencing the

15   government's motion where they are seeking to exclude evidence

16   related to other food vendors, other food products.  That's in

17   the government's motion in limine.

18        One of our arguments, not our only argument but one

19   of our arguments is if the witnesses are going to say that

20   certain things were strange or unusual with respect to SOMMA,

21   we have to be able rebut that to show how things were.

22        THE COURT:  If a witness testifies that something

23   was unusual, why shouldn't defendants be able to put on

24   evidence that it was not unusual, right?

25        MS. SAHARIA:  Exactly, Your Honor.

1          THE COURT:  If that's what you're saying.

2          MS. SAHARIA:  Yes.

3          MS. ZUCKERWISE:  If I may?

4          THE COURT:  Yes.

5          MS. ZUCKERWISE:  Your Honor, the evidence is not

6    going to show that this was the closest relationship that Eric

7    Goldstein ever had with any vendor or that he didn't have

8    close relationships with other vendors.  It's going to show,

9    there will be a proper foundation laid, that he had a close

10   relationship with this vendor and that it appeared that this

11   vendor got favorable treatment.  That doesn't mean that that

12   vendor got better treatment than any other vendor.

13          So putting in a litany of other vendors and other

14   products and other evidence about those food products to try

15   to disprove that point is not going to be probative of the

16   issue because it's -- they would have to put in evidence about

17   every single other vendor before the DOE in order to say that

18   it was not, that it did not appear to these DOE witnesses that

19   Mr. Goldstein was particularly close to this vendor.

20          THE COURT:  Yes.  I mean I think it's appropriate

21   for the government to put in evidence that SOMMA received

22   favorable treatment based on observations, not necessarily

23   impressions.  I don't think a witness can say, in my gut, my

24   gut reaction is that this was strange or unusual.  That, to

25   me, does not seem correct, that that should not come in.

31

1        I think if the government puts in evidence that

2   witnesses observe that SOMMA received favorable treatment, I

3   would think it's probably fair game if there is evidence that

4   other vendors received similar treatment so that it wasn't

5   that different, I think.  I'm not sure.  I don't think it

6   opens up the door to show that vendors did lots of other bad

7   things in and of itself.  So it's hard to thread the needle

8   here and it may be that we'll have to, we'll have to see.

9        I mean I think observations that SOMMA received

10  favorable treatment could indeed be relevant to whether it was

11  bribed, I mean whether Goldstein was bribed, I mean that's the

12  point, so that SOMMA could receive favorable treatment.

13  That's why they purportedly bribed Mr. Goldstein.  So I think

14  to that extent, it is relevant.  Whether the door is opened to

15  things by other vendors, we'll have to see and I would want to

16  keep a tight reign on that, but on some of that, we'll just

17  have to wait and see what happens.

18        MR. SUNDARAM:  Your Honor, can I just add something?

19        THE COURT:  Yes.

20        MR. SUNDARAM:  I'm understanding your inclination or

21  your ruling to be making a distinction between witnesses'

22  impressions and actual evidence from which a jury could infer

23  that there had been, that there was preferential treatment

24  here.  And I'm sorry if this mixes 4-A with 4-B.  This might

25  be more in IV-A but I think there's overlap here.

32

1          On the question of witnesses' impressions, our

2    contention, my contention is that for a DOE witness to say if

3    I had known about his relationship with these other, with

4    SOMMA, I would have done something differently, that falls in

5    the same category and is utterly irrelevant to my client's

6    intent.  That's the difference between the cases that support

7    the government, the <u>Cuti</u> case, and other cases.

8          In this case, the issue is whether Mr. Goldstein,

9    for example, had an intent to bribe or corrupt intent.  So the

10   fact that a DOE witness would have done something differently

11   doesn't shed any light on Mr. Goldstein's intent unless he

12   knew that.

13         THE COURT:  I don't know whether it sheds light on

14   his intent or not, but it sheds light on other issues that

15   are, you know, that are part of the trial including the issues

16   I articulated earlier.  I'm not changing my mind on that.  I

17   think we've exhausted that.

18         Motion number five:  Preclude the government from

19   introducing any argument that taxpayers are victims of the

20   charged offenses.

21         I don't know if there's a real disagreement.  The

22   government cannot argue that the jurors as taxpayers are being

23   harmed.  That would definitely be improper.  The government

24   can argue that the Department of Education, the general

25   public, school children are victims.

33

1          Anybody want to add anything?

2          MR. LOOBY:  Your Honor, yes.

3          We wouldn't be opposed to a general argument that in

4    a financial services fraud case, that the general public or

5    the DOE is, I guess, the victim of the offense, but targeting

6    specifically the school children ties back the risk to

7    children's health and really conflates the charged offenses

8    here with an offense, essentially, to put children's health at

9    risk and we think it injects unfairly these inflammatory

10   issues into the case and so an explicit appeal to the jury,

11   say, an argument or from a juror, from a witness that the real

12   victims here were the school children we submit would be

13   improper.

14         THE COURT:  Well, I don't know how it's going to be

15   done, but is it prejudicial?  Yes.  Is it unfairly

16   prejudicial?  I don't think so.  I mean, assuming the

17   allegations are true, then school children were being fed

18   chicken tenders that contained foreign matter.

19         Now, if it's not true, then it's not true, but I, to

20   me, it is relevant, it is prejudicial but it's not unfairly

21   prejudicial, and like anything, if the government makes too

22   much of it, then I would sustain an objection.  There comes a

23   point when too much is too much.  But in theory, it seems to

24   me that they are part of the victims.

25         Next, Mr. Iler's motion in limine to preclude his

1   statement that his attorney could answer the question.

2          I'm inclined to grant that motion.  I don't see

3   how -- I think, I don't know what it shows.  It's also fraught

4   with danger.  Frankly, it's an issue that could lead to a

5   reversal.  I would grant the motion.

6          I'll hear from the government if the government

7   wants to add anything.

8          MS. ZUCKERWISE:  Nothing to add, Your Honor.  Thank

9   you.

10          THE COURT:  Okay.

11          The government's motion in limine, docket number 98,

12   which is to permit testimony from a staff member who choked on

13   a SOMMA chicken tender.  I intended to cover this before.

14   I'll allow it for the reasons previously articulated.

15          Motion number 1B:  Admit evidence and argument on

16   theories of bribery supported by facts alleged in the

17   superseding indictment, even if not one of the four quid pro

18   quos identified by the government.

19          My inclination is this.  I don't see any references

20   to the stream of benefits or opportunities arise theories.  It

21   seems to me that would be injecting new theories.  I would not

22   be inclined to allow that.

23          As to other examples of quid pro quos, I think it

24   would be fair, you know, within reason, if there are some

25   additional examples as long as they fit within the charged

35

1   conspiracies.  I don't read the indictment as saying there

2   were only four quid pro quos.  The indictment carefully uses

3   phrases like "for example," et cetera.  That's where I'm at.

4         Anybody want to add anything?

5         MS. SAHARIA:  Your Honor, just for the record, we do

6   agree with Your Honor that the indictment does not charge a

7   stream of benefits or as opportunities arise theory.

8         As to other quid pro quos, we did move for a bill of

9   particulars and we filed a motion to dismiss on this point.

10  The government then superseded and in opposing our motions,

11  told us that they had identified the quid pro quos.  We relied

12  on that representation to the Court in not moving for a bill

13  of particulars.  We relied on that representation in being

14  prepared to defend the quid pro quos in the indictment and we

15  submit the government, for that reason, should not be able to

16  present additional quid pro quos to a jury.

17        THE COURT:  Are there other quid pro quos that the

18  government wants to raise?  Do we know or are we just talking

19  hypothetically here?

20        MR. POLEMENI:  Well, I think, Judge, the primary

21  quid pro quo is the chicken for beef deal.  It is the scheme

22  which is I'm going to, Eric Goldstein, I am going to support

23  your business before the DOE, I am going to get your chicken

24  products into the DOE, and you are going to help me with this

25  business.

36

          So it's not that there are just four specific quid
pro quos.  There is an overarching conspiracy.  There is an
overarching bribery scheme in this case and we don't want to
be --

          THE COURT:  The four quid pro quos are examples of
support for that overarching theory.

          MR. POLEMENI:  Yes, Your Honor.

          THE COURT:  Are there -- I mean the way this was
briefed, are there other specific examples of quid pro quos
that you are going to want to introduce evidence on?

          MR. POLEMENI:  I mean to the extent that --

          THE COURT:  I mean I agree that you should be able
to argue your main theory.  That's your main theory.

          MR. POLEMENI:  Yes.

          THE COURT:  That's the case.  And here are four
examples of things that prove it up.  I don't have a problem
with that.

          MR. POLEMENI:  Right.  We won't be saying, Judge,
well, they paid for a plane ticket for him to go to Poland
and, therefore, in exchange, he did X, Y, Z, and, jury, that's
why you should find him guilty, but it is certainly evidence,
again, of the overarching scheme so we are going to include --

          THE COURT:  There may be other things along the way
where he received some consideration.  You wouldn't
necessarily call it a quid pro quo.  It sounds like it would

1  be additional consideration --

2          MR. POLEMENI:  Yes.

3          THE COURT:  -- for the overall quid pro quo.

4          MR. POLEMENI:  Yes, Your Honor.

5          THE COURT:  Do you want to respond to anything?  I

6  mean it's hard to --

7          MS. SAHARIA:  I understand.  We're speaking, I

8  think, in the abstract.

9          THE COURT:  Yes.

10         MS. SAHARIA:  I will say that the theory that was

11 just articulated now, this overarching scheme of chicken for

12 beef, that was not in their motion either.  It is a new

13 articulation of the scheme even from what they put in their

14 motion.  Their motion talked about promoting SOMMA's products

15 in general and now we're hearing about a chicken scheme.

16         So we do have concern that the goal posts are going

17 to continue to be shifted in that way and that scheme, I

18 think, is too vaguely defined to qualify under McDonald so I

19 do have some concerns about how it was just articulated.  That

20 sounds like an as-opportunities-arise theory that's not in the

21 indictment.

22         THE COURT:  I don't hear it as an

23 as-opportunities-arise theory.

24         Did you want to add anything?

25         MR. POLEMENI:  Judge, I'll just state, you know,

38

1  paragraph 12 of the indictment clearly states, it's the first

2  paragraph, that the SOMMA defendants provided numerous

3  benefits to the defendant Eric Goldstein including enticing

4  Goldstein with potentially lucrative business opportunities

5  and making monetary payments to Goldstein and RMSCO for his

6  benefit, for Goldstein's benefit.  And then it goes on to say

7  what he did in exchange.  Then paragraph 13 very clearly says

8  that, you know, in a July 2015 meeting, Iler said that

9  Goldstein told him:  I'm going to buy a lot of chicken from

10  you guys.  Let's do the beef.

11         That we suggest, Your Honor, and allege is the

12  overarching scheme here.

13         THE COURT:  I don't have a be problem with what you

14  just said.  I will preclude adding the two theories:  Stream

15  of benefits and opportunities arise.  If there are other

16  examples, I don't know that I would call them quid pro quos,

17  that support the existing theory, I would likely allow it

18  subject to further, any further objections.

19         Next:  Preclude evidence regarding findings reached

20  by other government entities concerning alleged misconduct by

21  the DOE officials.

22         Now, I'm not sure that -- as I understand it,

23  defendants do not seek to elicit evidence of the conclusions

24  reached in the other investigation.

25         Yes?

1          MS. SAHARIA:  That's correct, Your Honor, we do not

2    seek to admit the actual findings but evidence related to the

3    investigations may be relevant in other ways.

4          THE COURT:  I think that's probably true, and the

5    government probably agrees that some of the evidence might be

6    relevant to this claim.  It's hard -- I mean, well, first let

7    me say this.

8          The conclusions reached in the other investigations,

9    in my opinion, are not relevant.  You know, among other

10   things, the DOI investigation, it was just a draft.  It was

11   looking at other issues.  On the other hand, I think both

12   sides are suggesting that there may have been statements along

13   the way, specific evidence either uncovered or created as part

14   of those investigations that could be relevant as long as they

15   pertain to issues in this case.

16         It's hard for me to say none of it is -- I won't say

17   none of it is admissible.  I mean some of it might be

18   admissible.  Some of it might be admissible for impeachment,

19   but I think that's the best I can do right now without knowing

20   what specific things there are.

21         In other words, I'll grant the motion as to the

22   conclusions reached in those investigations.  I'll reserve

23   decision on the admission of other evidence concerning the

24   investigations.

25         What about the fact that there were investigations,

1  is that going to come in?  Is that something the parties have

2  talked about?  Is that inevitably going to come in?

3          MR. POLEMENI:  I don't know if it's inevitable.  I

4  don't believe that the government anticipates eliciting that

5  sort of evidence or testimony at this point.

6          THE COURT:  Okay.

7          MS. SAHARIA:  I think it's possible, Your Honor.

8  For instance, the fact that someone brought a complaint could

9  be evidence of bias.  I don't know whether it will be but it

10  could be depending on the nature of the testimony at trial

11  and, of course, if there's an opportunity to impeach using

12  statements given to investigators, there will need to be some

13  context to how those statements were provided, but we could

14  figure out what the best --

15          THE COURT:  I mean that's fair.  At some point, if

16  it comes out, I might have to give an instruction that you've

17  heard evidence about other investigations, do not concern

18  yourselves with those investigations or what conclusions might

19  or might not have been reached.  I can give something along

20  those lines.

21          I mean I think I'm agreeing that there may be

22  evidence, statements, et cetera, that could become relevant

23  for both sides, but the government is not planning on

24  eliciting the fact of investigations and we'll have to see,

25  but just so it's clear, I do not think the conclusions or

41

1    tentative conclusions reached in those investigations are

2    relevant.

3              Yes?  Do you want to add something?

4              MR. POLEMENI:  No, Judge.

5              THE COURT:  No?  Okay.

6              Motion number three:  Preclude evidence or arguments

7    regarding defendant's prior good acts, including their

8    production of documents in response to grand jury subpoenas.

9              I'm not sure what this entails.  I think complying

10   with a subpoena is not relevant.  I don't know what else there

11   might be covered by this.  I mean, in general, prior good acts

12   is not relevant unless, just like prior bad acts, unless

13   there's some reason for it to come in, but I don't, you know,

14   complying with the subpoena I don't see as relevant.

15             MS. SAHARIA:  May I be heard on that, Your Honor?

16             THE COURT:  Yes.

17             MS. SAHARIA:  I do think the government will intend,

18   and we've heard some of that today, intend to put at issue the

19   defendants' states of mind in 2017 and after the charged

20   offenses with respect to concealing certain information and

21   the government has raised in its motion its intent to argue

22   that our client, Mr. Twomey, concealed information from a DOI

23   investigation.

24             We do think that if the government is going to open

25   the door with that kind of evidence, that it would be only

42

 1   fair for us to respond with evidence that he voluntarily

 2   turned over documents to the grand jury.  So if they're going

 3   to open the door --

 4           THE COURT:  I don't see how -- first of all, I don't

 5   know that it's voluntary if it's in response to a subpoena,

 6   number one, but number two -- look, the door may be opened on

 7   something, it's possible, and then you can renew the request

 8   at that point but right now, I don't see the relevance of

 9   compliance with subpoenas.

10           MS. SAHARIA:  Understood.

11           As to the good acts issue, I think that's the kind

12   of thing that will have to be taken up as it comes.  We're not

13   obviously going to argue that a prior good act is evidence of

14   a tendency to be a good person, but this goes to the issue of

15   whether, for instance, Mr. Goldstein did other things with

16   respect to other school vendors that would show he did not

17   treat SOMMA unusually, so there may be some relevance to those

18   kinds of actions.

19           THE COURT:  Well, that wouldn't be propensity

20   evidence.

21           MS. SAHARIA:  Exactly.

22           THE COURT:  It's something different and we'll have

23   to cross that bridge.

24           Just to be clear though, I don't want to spend a lot

25   of time in front of the jury arguing motions.  So if there are

43

1  these things that I've reserved on and that come up, you'll

2  need to raise them before the jury gets here or at the break

3  or at lunchtime or at the end of the day.

4         Motion number four:  Preclude evidence or argument

5  concerning food vendors other than SOMMA or allegations of

6  misconduct on the part of non-defendant DOE officials.

7         I'm not sure, I'm not sure where we are with this

8  and I think it may depend on what it is.  I don't think it's

9  relevant that a child choked on a meatball provided by another

10  vendor in 2011, for example.

11         Actually, this is what I was thinking about the

12  issue.  If there's testimony that what happened here was

13  unusual, then it may be, it may open the door to some other

14  evidence.  So we've kind of discussed this one already, I

15  think.  The bottom line is I think I need to reserve on this.

16  I've provided some guidance I hope so far.

17         Does anyone want to add anything?

18         MS. SAHARIA:  No, Your Honor.

19         MR. POLEMENI:  No, Your Honor.

20         THE COURT:  Okay.

21         Number five:  Admit defendants' statements and

22  preclude defendants from introducing their own hearsay

23  statements.

24         I mean, in general, this is the rule.  A defendant's

25  statements, if they are relevant, can come in as an admission,

1   but other parts of the defendant's statements, if they're not

2   relevant, are hearsay.  There may be some exceptions for

3   context, et cetera.

4         I think the government doesn't mention any

5   statements specifically other than Mr. Turley's statements.  I

6   would grant the motion as to Mr. Turley's statements.  I think

7   it comes in.  I think they come in as admission of a party

8   opponent.  As to others, I don't know what they are.

9         Yes?

10        MR. GOELMAN:  Your Honor, the government offers

11  Mr. Turley's statement and we have no issue with 801(d)(2)(b)

12  or (d)(2)(a), that it applies one way and not the other way.

13  We are not asking for equal treatment there.  We are asking

14  for equal treatment in terms of non-hearsay uses.

15        They say Mr. Turley told us something that wasn't

16  true, we're offering this to show his consciousness of guilt

17  but, defendants, you're not allowed to ask questions that he

18  answered truthfully to show consciousness of innocence.

19        Relevance is a two-way street.  So if it is not

20  hearsay because it's not being offered for the truth of the

21  matter, that applies for both parties, Your Honor.

22        THE COURT:  Well, I think they're offering it, it's

23  not hearsay because it's an admission.

24        MR. GOELMAN:  They're saying it's not true so

25  they're not offering it for the truth.

45

1          THE COURT:  Well, I'm not sure what you're saying.
2     You're still objecting to it coming in or you have other
3     statements that you want to offer?
4          MR. GOELMAN:  No.  I'm objecting to the idea that
5     they can offer it for a non-hearsay purpose but we can't offer
6     truthful statements to negate the presumption of consciousness
7     of guilt.
8          THE COURT:  If there's something you want to offer,
9     then run it by the government and they might agree, there are
10    some exceptions, or I can cross that bridge when we get there.
11         MR. GOELMAN:  Okay.  I mean --
12         THE COURT:  The Turley statements are admissible.
13    If there are some other statements that you want to offer,
14    I'll cross that bridge when we get there.
15         MR. GOELMAN:  I'm sorry, Your Honor.  I'm not being
16    clear.
17         They're saying -- Mr. Turley was interviewed for a
18    half an hour.  He made a bunch of statements.  They're saying
19    we want to offer these four isolated snippets where he said
20    things that we say aren't true.  We want to ask the agent
21    Mr. Turley also told you these other things during that
22    interview that are true also for non-hearsay purpose, and even
23    if it was hearsay, we would submit --
24         THE COURT:  You want to ask the agent, you know,
25    didn't Turley answer some questions truthfully?

1          MR. GOELMAN:  Yes, didn't he admit that he knew

2    Mr. Goldstein, didn't he admit this, didn't he admit that,

3    yes.

4          THE COURT:  Why doesn't that fall within the rule

5    that you can't put in hearsay statements?  You're not offering

6    it for the truth; you're just offering it for the fact that he

7    told the truth?

8          MR. GOELMAN:  Right.  We're offering it for

9    consciousness of innocence.  It's not disputed whether or not

10   those things are true, Your Honor.  The parties agree that he

11   met Goldstein in 2013.

12         THE COURT:  What's the response?  Response?

13         MS. ZUCKERWISE:  Your Honor, the government

14   anticipates that the testimony may go beyond those four

15   statements and so agrees that it's a little premature to get

16   into what would be required under the rule of completeness or

17   for another purpose, and I think this is --

18         THE COURT:  Well, the argument is that it's not

19   hearsay because they're not offering it for the truth.  They

20   would be offering it just to show that he was truthful.

21         MS. ZUCKERWISE:  Your Honor --

22         THE COURT:  I mean what does it show, that he

23   answered some questions truthfully?

24         MS. ZUCKERWISE:  Certainly, Your Honor, he could be

25   allowed some cross.  In a vacuum, without looking at it as to

47

1  whether some questions were answered truthfully, but we're not

2  there right now and we will be there, we respectfully submit

3  that this is something that should be determined.

4           THE COURT:  Yes, I'll reserve.  I'll reserve on what

5  you want to ask and maybe you can reach an agreement on it.

6           MR. GOELMAN:  Thank you, Your Honor.

7           THE COURT:  Okay.  And as to other, I don't know

8  what other specific statements there are.  We'll have to deal

9  with those when we know what they are.

10          Motion number six:  Admit statements of the

11  defendants' agents.

12          Defendants say the government hasn't identified any

13  specific statements.  I'm not sure what we're talking about.

14          MS. ZUCKERWISE:  Your Honor, just to clarify the

15  general principle --

16          THE COURT:  Yes.

17          MS. ZUCKERWISE:  -- many of the exhibits that the

18  government plans to put into evidence are statements of

19  defendants' agents.  So rather than arguing about this, for

20  each and every exhibit that the government attempts to admit,

21  just to clarify, the general principles are to the extent the

22  government lays a foundation, as I profess the government

23  will, that these defendants or, excuse me, these witnesses

24  were agents or these speakers, rather, in the e-mails were

25  agents and that the testimony was in the scope of the agency,

48

1    et cetera, that they can be admitted.

2         THE COURT:  Yes, I mean I know there is the

3    requirement of a foundation.  The agent employees must be

4    directly responsible to the defendant employee.  The statement

5    must have been made about a matter within the scope of their

6    relationship while it existed.

7         There are some -- you know, I'm aware of what the

8    requirements are.  It depends on the relationship, some of the

9    context, so we'll have to see.  I'm inclined to allow it as to

10   Barrett, who as I understand it was directly responsible to

11   Mr. Goldstein, but we can see if the foundation is laid, then

12   we'll see.

13        MS. ZUCKERWISE:  May I ask one clarifying point,

14   Your Honor?

15        THE COURT:  Yes.

16        MS. ZUCKERWISE:  So based on Second Circuit case

17   law, we don't read the "directly responsible" phrase to

18   necessarily require that one person is someone else's direct

19   report.  So it would be helpful to get a sense of whether --

20        THE COURT:  Well, I may have been relying on the

21   defendants' brief for that.  If the defendants overstated,

22   then we'll take a look at it.  I, I was relaying what I had

23   read somewhere.

24        So you're disagreeing on what the standard is?

25   We'll take a closer look at it.

1          MS. ZUCKERWISE:  Okay, Your Honor.

2          THE COURT:  Rioux and Zaken, we'll take a closer

3    look.

4          MS. ZUCKERWISE:  Thank you, Your Honor.

5          In particular, in Zaken, the Second Circuit found

6    that an officer of a company is "in essence, directly

7    responsible" to the owner of a company which shows not a

8    formalistic type of assessment but, rather, requires a factual

9    look at the actual relationship.

10          THE COURT:  I'm not sure that the Second Circuit is

11    being precise when it says, "in essence, directly

12    responsible," but we'll see if we can figure it out.

13          Motion number seven:  Preclude evidence or arguments

14    about defendants' potential punishment or other consequences

15    if granted.

16          The defendants concede they can't bring up the

17    possible term of imprisonment and that, of course, is correct.

18    I don't have a problem with defendants saying this case has

19    serious consequences for the defendant.  It does.  So I don't

20    know if there's anything more to it.

21          Anything more?

22          MS. SAHARIA:  No, Your Honor.

23          THE COURT:  Okay.

24          Motion number eight:  Preclude defendants from

25    introducing materials not disclosed to the government by

50

1    today.

2              Where are we with that?

3              MS. ZUCKERWISE:  Your Honor, there's -- I'm sorry.

4              MS. SAHARIA:  Yes.  So, Your Honor, our exhibit list

5    I understand is due today.  We will be, of course, producing

6    it today.

7              We did make a production of documents that will be

8    on that exhibit list last week and are making another

9    production of those documents today.  So we will have

10   disclosed the exhibits as of today that we intend to use in

11   our case in chief.

12             Now, of course we are learning new things about the

13   government's case every day.  They just amended their exhibit

14   list over the weekend.  So, of course, as these things go,

15   there may be things we learn at trial and we discover we need

16   to produce new documents in response and that's just how trial

17   goes.

18             THE COURT:  The motion is granted so that defendants

19   are precluded from introducing materials not disclosed by

20   today with the caveat that if there is something that wasn't

21   produced for good cause, I would consider allowing it, but

22   there's got to be some good cause such as the government doing

23   something to only raise the issue belatedly.  All right?

24             MS. SAHARIA:  Yes, Your Honor.

25             THE COURT:  Motion number nine, which is part of the

1   government's opposition ECF 99:  Preclude the testimony of

2   defendants' proposed expert witnesses Clayton Gillette,

3   Parthapratim Basu and George Stamas.

4          Gillette, who wants to be heard?  Yes?

5          MR. GRUBIN:  If I may, just very quickly, I think we

6   also covered Dr. Basu so I believe we can move that to the

7   side.

8          THE COURT:  Agreed.

9          MR. GRUBIN:  For Professor Gillette, just the

10  proffered expert testimony is completely irrelevant to the

11  case for just a host of reasons.

12         I mean just quickly, the expert disclosure that they

13  provided states that he's going to provide an opinion

14  concerning whether under New York law, a contract, this DOE

15  contract permits the DOE to impose liquid damages on a

16  manufacturer, I assume that means SOMMA, and also ask whether

17  it permits it on the manufacturer, again, meaning SOMMA, when

18  they make a full delivery to the distributor, when they fail

19  to make a full delivery to the distributor but the distributor

20  approves substantive goods to the department.  So that's

21  irrelevant for a number of reasons.

22         The first is what the evidence is going to show is

23  that everyone at the DOE, the staff making the decisions,

24  believed that they, including the contracting office, believed

25  they could impose liquid damages on the distributor, the

1   distributors that came to the schools, and they agreed they

2   could and that they would be imposing a fine on the

3   distributors.

4         The evidence will also show -- I brought some of the

5   evidence with me:  Text messages, e-mails.  It's very clear.

6   The evidence will show that the SOMMA defendants were very

7   concerned and they strategized about how to get Goldstein to

8   intervene and then, you know, they decided to, our allegation

9   is they decided to bribe him by sending him a PowerPoint

10  presentation reminding him of how much money he'll make with

11  them.

12        That's what matters.  It doesn't matter that five

13  years later, an expert is going to come in and say that, look,

14  under the rules of construction and the reading of these

15  different regulations and the contracts, that actually they

16  could not impose a fine.  It doesn't matter if a fine could or

17  could not have been imposed.  What matters is what, is that

18  DOE officials thought they were going to, the SOMMA officials,

19  the SOMMA defendants thought they were, and they intervened,

20  that they had a corrupt intent.  That's what matters, not that

21  a SOMMA litigation down the road --

22        THE COURT:  Let me hear from defense counsel.  I'll

23  hear from defense counsel.

24        MR. GRUBIN:  Sure.

25        MR. LOOBY:  Yes, Your Honor.

53

1          So the defense will show that there was one DOE

2     witness adamant on imposing the fine not on the distributor,

3     but on SOMMA.  As Mr. Gillette's disclosed opinion shows, the

4     contract did not provide for liquidated damages on a vendor

5     like SOMMA who was not a party to that contract.  The evidence

6     will also show that the SOMMA defendants and the DOE

7     interacted regarding arguments around these legal issues,

8     around whether or not the contract provided for that.

9          The defendants are entitled to argue that they did

10    not have a motive to bribe or a corrupt intent, as the

11    government alleges, because they were simply pointing out that

12    the DOE did not have the authority --

13          THE COURT:  The argument is that the DOE personnel

14    thought they could impose fines and that the defendants bribed

15    them not to.

16          MR. LOOBY:  Right.  Well, actually, Your Honor --

17          THE COURT:  And so, therefore, it's irrelevant

18    whether the contract provided for liquidated damages.

19          MR. LOOBY:  Well, a lower level employee of the DOE

20    believed they could.  Ultimately, the DOE did not do that, and

21    the jury is going to be asked to assess whether or not the

22    ultimate decision by the DOE was because the DOE was following

23    the law and not imposing an illegal fine or whether or not

24    that is a quid pro quo.  And evidence surrounding the fact

25    that the government's witness who is pressing that she wanted

54

1    to impose the fine, that she was wrong which the government

2    has not contested, the contract can't be read that way, is

3    relevant to everybody's understanding of the dispute.

4            From the SOMMA defendants' perspective, there is no

5    motive to, corrupt motive to bribe when you are raising

6    legitimate, and the evidence will show, a well thought out

7    e-mail pointing out these very same points and from

8    Mr. Goldstein's perspective, ultimately, that the DOE went the

9    right route, did the right thing, it's not a complete defense

10   to a bribery allegation like the cases the government cites,

11   but it's certainly relevant and the government in its

12   opposition is conflating --

13           THE COURT:  The government cites some law that an

14   expert can't opine on the parties' obligations under a

15   contract.

16           MR. LOOBY:  Your Honor, those cases primarily deal

17   with situations where legal opinion is offered on the ultimate

18   issue which is on the laws and regulations under which a cause

19   of action accrues and it's being litigated.

20           So they cite that, the Diners case from the '70s,

21   that's a real seminal case on this point and it's about

22   whether or not -- the disputed issue in that case was whether

23   or not the parties used their best efforts to sell a stock, to

24   register a stock, and the expert there opined this is what

25   best efforts means and, you know, I think as matter of law,

1   they did not, and the court held that that encroached on the

2   jury's function.

3            Here, this testimony is going to provide essential

4   background that does not come anywhere close to the ultimate

5   issue in the case under the statutes that are alleged but is

6   critical for the jury to understand and evaluate the

7   government's allegation that this action by the DOE was taken

8   only because of a bribe or principally because of a bribe or

9   in any way because of a bribe because the DOE did the right

10  thing, the DOE did not impose an illegal fine, and the

11  government's witness who was asking for that to happen is

12  legally incorrect and this is all relevant.

13           THE COURT:  Yes.

14           MR. GRUBIN:  Just a couple of things.

15           The first is that what matters, and the cases the

16  government cited on this and the defense responded and

17  cited --

18           THE COURT:  What about on the issue of intent, does

19  it go to the issue of intent?

20           MR. GRUBIN:  No, because it's, you could -- we cited

21  a bunch of cases.

22           THE COURT:  The argument is there was no reason,

23  there was no reason to bribe, not to fine because they

24  couldn't fine.

25           MR. GRUBIN:  Right.  You could bribe -- I mean, the

56

1   things we said, right, in <u>Alfisi</u>, the Second Circuit case,

2   there's still corrupt intent when you're bribing to procure

3   lawful action or what you believe to be lawful action from a

4   government official, and that cites the <u>Blagojevich</u> case, I'm

5   pronouncing his name wrong, the former governor's name wrong,

6   but the Seventh Circuit case, right, where they're saying --

7          THE COURT:  I'm going to reserve decision.  I'll

8   issue something probably tomorrow.  If not tomorrow, then

9   Wednesday.  I want to just go back.  I think there's a summary

10  of his testimony as an exhibit.

11         MR. LOOBY:  Yes, it's appended to our reply.

12         MR. GRUBIN:  Judge, the only thing I'll add is that

13  the summary, the testimony that he's offering is about a fine

14  on distributors.  No one -- or manufacturers, excuse me, which

15  would be SOMA.  No one in our -- we're not going to offer

16  evidence or suggest that a fine could have been imposed on

17  SOMMA.  It's that a fine could have been imposed on the

18  distributors.  So it's irrelevant for that entire other reason

19  too, Your Honor.

20         MR. SUNDARAM:  Your Honor, if I can just add one

21  thing.

22         THE COURT:  Yes.

23         MR. SUNDARAM:  With respect to Mr. Goldstein, the

24  government is accusing him and charging him of intentionally

25  giving preferential treatment to SOMMA based on his business

57

1    relationship.  So it's hard for me to fathom how, if that's

2    their accusation, that it's not relevant that what

3    Mr. Goldstein, the position he took was consistent with the

4    contract and consistent with the law.  That is some evidence

5    that the reason he did it was on the merits.

6            If somebody is doing something on the merits, that

7    needs to come in if they're being accused of doing something

8    to give, out of self-interest to give their partners

9    preferential treatment.

10           THE COURT:  I'll reserve decision.

11           MR. GRUBIN:  Okay.

12           THE COURT:  And George Stamas, the government does

13   not object to him testifying as an expert on limited liability

14   corporations.  The concern was that there was a little

15   fuzziness in the language?

16           MR. GRUBIN:  Yes, Your Honor.  I mean, again, the

17   new amended Rule 16 is very clear about what's required and it

18   applies to both sides because expert litigation --

19           THE COURT:  Let me ask defense counsel whether

20   Stamas is going to provide anything else other than what was

21   disclosed.

22           MR. LOOBY:  Your Honor, we think our disclosure is

23   clear and it is the testimony that we would offer as of this

24   moment, this is what we would intend to offer through him.

25           I think the government's motion reaches a little bit

58

1   further than that and takes advantage of the situation where

2   the government is going to put on its case first.  Of course,

3   the rules require us to disclose the opinions that we intend

4   to offer, but evidence at trial, you know, may come in

5   differently than we expect in which case, Mr. Stamas could

6   have been opinion or a variation on an opinion that could be

7   relevant.

8           THE COURT:  Mr. Stamas will be limited to what he

9   provided in his disclosure.  If he wants to add anything new

10  because of something that developed during the trial,

11  defendants will have to show good cause and I'll rule on it

12  then.

13          MR. LOOBY:  Thank you, Your Honor.

14          THE COURT:  Okay?

15          MR. M. KELLY:  Your Honor, Michael Kelly on behalf

16  of Brian Iler.

17          THE COURT:  Yes.

18          MR. M. KELLY:  One clarifying point.  We put forth

19  the testimony of Dr. Basu.  I want to be clear, we weren't

20  limiting it to just the recall issue.

21          Part of what he's going to testify about, and it's

22  included in the disclosure, is that SOMMA was not at fault for

23  the foreign material that was in the chicken, that that fault

24  resided both in the manufacturer as well as the supplier and

25  he's going to base his testimony on federal regulations.

1          I just want to be clear in case that was still an

2    issue that that is what we still intend to do particularly in

3    light of the Court's ruling that --

4          THE COURT:  Well, how does he know whether SOMMA was

5    at fault or not at fault?

6          MR. M. KELLY:  He knows based on his 30-some years

7    as a regulator, Your Honor, in interpreting federal safety

8    regulations which put the obligation on what's called the

9    official establishment which is the entity that has the USDA

10   license, that has the inspectors onsite, and that is

11   responsible for producing food that is safe in the stream of

12   commerce.

13         THE COURT:  My understanding was that Dr. Basu was

14   going to opine that the holds should have been denominated a

15   recall and it sounds like that's not a relevant issue.  That's

16   the basis of my ruling.

17         MR. M. KELLY:  Understood on that issue, but I want

18   one or two others that we put forward, so I didn't want to be

19   pigeonholed on that.

20         THE COURT:  Well, I didn't focus on the other two

21   issues.  What are the other two issues?

22         MR. M. KELLY:  The other two issues was who was at

23   fault for the foreign material in the chicken tenders and the

24   second issue was SOMMA's response once the chicken, the

25   foreign material is identified, whether or not that was

60

1  reasonable from his perspective as a former federal regulator.

2          THE COURT:  What's the government's response?

3          MR. GRUBIN:  It doesn't, none of this -- to bring in

4  an expert to talk about who is civilly liable for food, for

5  food and foreign matter in the chicken, none of that matters.

6  That's not what the case is about.  It doesn't matter who's

7  civilly liable.  The government is not going to say that SOMMA

8  is liable.  At the end of the day though, SOMMA was putting

9  food in, they had problems, they needed help from Goldstein

10  and they went to Goldstein.  That's what matters.  This is a

11  sideshow and to bring in an expert to talk about place of

12  establishment in civil liability and as a manufacturer

13  versus --

14          THE COURT:  Well, in other words, even assuming it

15  was another company that was directly responsible for the

16  foreign matter, it was still SOMMA that put it to the

17  Department of Education.

18          MR. GRUBIN:  Of course.  Correct, Your Honor.

19          MR. M. KELLY:  And, Your Honor, my quick response is

20  I would agree with that if there wasn't going to be focus on

21  food safety in the trial.

22          THE COURT:  My ruling stands.  I'll preclude the

23  testimony of Dr. Basu.

24          Okay.  The government submitted an April 28th

25  letter, document number 102.  It's a Giglio motion:

1  Cross-examination of unnamed government witnesses; allegations

2  from the qui tam action; cross-examination of Mr. Barrett

3  about his likely dementia.

4        It's hard to, hard to evaluate without knowing what

5  we're talking about.  I think we covered the prior

6  investigations and the results thereof.  It's unclear about

7  specific evidence relating to the investigation.

8        What about Mr. Barrett's health?  The defendants

9  want to cross-examine Mr. Barrett about his dementia?

10        MR. SAHARIA:  I think the government agrees in its

11  motion that his memory is relevant.  They just asked for some

12  undefined limit on questioning.  I can't know what we will or

13  will not do without seeing him on the stand but, of course,

14  we're not going to harass Mr. Barrett, intentionally do not.

15        THE COURT:  Okay.

16        Are there other specific statements that we should

17  talk about today or what?

18        MR. GRUBIN:  Your Honor, briefly one thing that

19  wasn't covered by the motion that I just wanted to raise for

20  the Court.

21        One of the government's witnesses, Romano, is the

22  accountant for RMSCO and it so happens that he was also the

23  accountant, Your Honor, for one of the AUSAs on the case prior

24  to joining the case.  Once on, the AUSA notified DOJ's Ethics

25  office.  Everyone said it's fine, it's not a big deal, there's

62

1   no payments owed, no work has been done since they've joined

2   the case and, you know --

3           THE COURT:  Do the defendants want to cross-examine?

4           MR. ROMERO:  I should have told them earlier.  We

5   have no issue with this, Your Honor.

6           MR. GRUBIN:  Great.  Thank you.  That's it,

7   Your Honor.

8           THE COURT:  Any other specific issues to discuss?

9           MR. GRUBIN:  Thank you.

10          Just one other one on Samantha Biletsky.  They may

11  not have had a chance to see it but I sent it this morning but

12  I did send records from the State Controller's Office that

13  she, in fact, resigned, you know, months after this whole

14  investigation.  So there is no, at this point, good faith

15  basis for crossing her on an incorrect New York Post article

16  saying that she was fired.

17          THE COURT:  Do defense want --

18          MR. N. KELLY:  It was produced today.  We'll have to

19  look at it.

20          THE COURT:  Okay.

21          MR. GRUBIN:  That's fine.

22          THE COURT:  Any other specific witnesses or issues?

23          MS. SAHARIA:  I don't believe so, Your Honor.

24          THE COURT:  If anything else comes up, you'll let me

25  know.

63

1          I have all these motions to quash.  Initially, there

2    was an error on the face of it referring to the former clerk.

3    Now the error has been fixed.  The subpoenas have also been

4    narrowed.

5          I don't believe I have a response from the

6    government.  Another letter came in around 2 o'clock from SCI

7    and I don't know if defendants want to respond to that.

8               MR. WARREN:  Your Honor, Zack Warren.

9          The motions that were filed, there's three motions

10   now.  There's one from the government, one from the SCI and

11   one from DOI.

12          The defense has responded to most of the motions.

13   There's an additional fourth motion that came in which is to

14   preclude testimony from certain SCI investigators.  So that

15   subpoena at issue in the motion today has nothing to do with

16   documents.  The document subpoena issue is ripe, Your Honor,

17   and I'm happy to address that.

18               THE COURT:  Did the government respond to the

19   narrowed subpoenas?

20               MS. McTAGUE:  No, Your Honor, but I am prepared to

21   do so today.

22               THE COURT:  Okay.  Let's hear from the government

23   first then.

24               MS. McTAGUE:  Your Honor, despite the revisions made

25   on the subpoenas since the initial batch was sent out by the

64

 1   defense, it is the government's position that the revised

 2   subpoenas are still overbroad, overly burdensome and are being

 3   used by the defense as a means of bypassing the discovery

 4   process.

 5          Many of the subpoenas seek materials related to

 6   prior statements of prospective witnesses as well as personnel

 7   records going back several years and they're, therefore, being

 8   used solely for the purpose of impermissible impeachment.

 9          Your Honor, there are a number --

10          THE COURT:  There's a legal question as to what

11   17(h) means.  I think the parties disagree about that.

12          MS. McTAGUE:  That's correct, Your Honor.  I can go

13   through each of the subpoenas at this time.  That will likely

14   be lengthy.

15          THE COURT:  I don't want to.  And I haven't really

16   had time.  I mean some of this stuff came in today.  Some of

17   it came in yesterday or Friday.  I haven't had time really to

18   look at it all in any, in any detail.  On the other hand, I'm

19   concerned that we need to get this done.

20          Let me ask defense counsel to comment.  It does have

21   the feel of discovery, you know, last minute, last minute,

22   near last minute subpoenas for still a wide number of

23   documents and it has the feel of discovery when we should be

24   focusing on trial.

25          MR. WARREN:  A few things to that, Your Honor.

65

1          First off, most of what is sought in the subpoenas

2     is prior statements of government witnesses.  That cannot

3     possibly be characterized as discovery.  Those are prior

4     inconsistent statements by the government's witnesses.  And

5     let me just set the record on what actually happened here,

6     Your Honor.

7          The government's trial witnesses were interviewed

8     repeatedly by SCI and DOI investigators on the exact issues or

9     many of the issues in this case, specifically, whether or not

10    certain vendors received preferential treatment.  Those

11    witnesses were asked about SOMMA foods.  They gave information

12    about SOMMA foods which is, of course, the company at issue in

13    this case.

14         The government did not produce those statements.  We

15    fought, as Your Honor well remembers in the context of the

16    qui tam complaint, and at last, after that fight, the

17    government turned over materials that were not only relevant

18    and material to the defense but highly exculpatory.  We asked

19    the government to produce additional interview memos and

20    witness statements relating to the government's own witnesses

21    on the relevant issues and the government responded that those

22    documents were not in its possession, custody and control.

23         So we said, okay, we'll go get them from the

24    agencies that do have those statements.  Again, we noted that

25    they were relevant and they relate specifically to government

66

1   witnesses.  We sent a subpoena to those agencies that's now

2   very narrowly tailored to obtain interview memos relating

3   specifically to the allegations in this case.

4          The government says that Rule 17(h) precludes us

5   from doing that.  That's not right, Your Honor.  Rule 17(h) is

6   a corollary to the Jencks Act and Rule 26.2.  What 17(h) says

7   is it says, Look, when you're trying to get a witness

8   statement from the government, the way to do it is through the

9   Jencks process.  Right?  The witness testifies and then you

10  get the statement.  That obviously doesn't apply to statements

11  that are not in the possession, custody and control of the

12  government which is a position that they're taking here.

13         So we're trying to go get those statements that the

14  government has said it will not produce, under the Jencks Act,

15  we're trying to go get those statements from the agencies that

16  possessed them and there's plenty of cases saying that

17  Rule 17(h) does not apply in that situation.

18         So all we're trying to do is go get prior

19  inconsistent statements by the government's witnesses --

20         THE COURT:  How do you know that they are

21  inconsistent?

22         MR. WARREN:  I know, Your Honor, because the few

23  examples that the government has produced so far are

24  inconsistent with the statements that the witnesses have made

25  to the FBI agents.  Witnesses are now telling the FBI agents

67

1   that there was preferential treatment and misconduct.  We have

2   examples of memos that the government has produced where the

3   witnesses said there was no preferential treatment.

4        I can't imagine something that is more important and

5   relevant in a criminal case to be able to impeach a government

6   witness with his or her prior inconsistent statement.

7        THE COURT:  Does the government want to add

8   anything?

9        MS. McTAGUE:  Yes, Your Honor.

10       First, towards the Rule 17(h), relying on United

11  States versus Zhu and United States v. Vasquez, Rule 17(h)

12  applies only to witness statements already in the government's

13  possession.  These statements are not in the government's

14  possession.  The argument --

15       THE COURT:  Right, but that's why they're trying to

16  subpoena them from the other agencies.

17       MS. McTAGUE:  Yes, Your Honor, but the fact is that

18  they are not inconsistent.  The memorandum that they have is

19  sufficient to cross-examine the witnesses.  And the scope of

20  which the defense, the scope of the material of which the

21  defense is seeking is incredibly overbroad.

22       Pointing out to the subpoena most recently issued to

23  SCI, it notes all summaries, memorandum, audio recordings,

24  video recordings in regards to several witnesses concerning

25  not only the defendants but all other DOE food vendors.  This

1  is a fishing expedition.  Sub 4:  The documents or

2  communications, audio recordings and video recordings that

3  were produced or given to you in connection with case number

4  and then it cited the SCI case number.

5      That investigation was an extremely broad

6  investigation that went through the DOE's relationship with

7  all food vendors and then also concerned itself regarding

8  travel reimbursements with other food vendors.  That is

9  broadly beyond the scope of what is at issue at this trial.

10  So to request these materials that are largely irrelevant and

11  inadmissible is a fishing expedition and especially in regards

12  to a subpoena that was sent to Ms. Asher, that is an end run

13  around the discovery process in the qui tam litigation.

14      What they asked of Ms. Asher is:  "Documents

15  sufficient to show each instance between January 1, 2010 and

16  December 31, 2016, when the New York City Department of

17  Education imposed liquidated damages on an approved brand food

18  manufacturer or supplier," and then listed out different

19  situations where an unnamed distributor may have acted in a

20  particular way.

21      That is overbroad.  The scope of this goes back over

22  a decade.  Ms. Asher, as a single employee, cannot reasonably

23  comply with this on the eve of trial.

24      Noting further for what they're requesting of

25  Ms. Asher:  All documents and communications including,

1  without limitation, e-mails, voicemails, text messages or

2  other messages sent on phone or computer applications with

3  several DOE employees between January 1, 2015 and the present,

4  not only concerning defendant SOMMA, Defendant Goldstein, but

5  Department of Education food vendors.

6       Not only are these broad overly burdensome requests,

7  but they specifically make note of documents relating to the

8  lawsuit and complaints filed against the New York City

9  Department of Education.  That is the pending qui tam action.

10 This is an end run around the protective order that is in

11 effect right now and as well as the civil litigation

12 discovery.

13       THE COURT:  Okay.  Thanks.

14       Yes?  Final word.

15       MR. WARREN:  Final word.  I just want to respond to

16 this idea that we are not allowed to use Rule 17(h) to

17 subpoena impeachment material.  There's no case law support

18 for that.

19       THE COURT:  I will look at that.  I am concerned

20 about how broad the subpoenas are, the Asher one.

21       MR. WARREN:  The Asher subpoena asks for her

22 communications on a very narrow set of topics with particular

23 individuals relating to the allegations --

24       THE COURT:  You're saying narrow.  The government is

25 saying really broad.  I'll take a look at it.

70

1          MR. WARREN:  Okay.  I would just say --

2          THE COURT:  The problem is -- I'll take a look at it

3    and try to rule tomorrow or Wednesday so that the parties have

4    an idea.

5          This has to stop, by the way.  I can't keep

6    getting -- there's so many issues.  It just -- this is

7    ridiculous.  There's so many submissions.  I understand this

8    is very important but this is unlike, frankly, any case I've

9    ever been on.  I don't know what the problem is but the

10   volume, the frequency, I don't understand, and the length of

11   things.  Let's just be judicious about this, you know, and

12   hopefully, I understand we want to rule on all these issues

13   and get them out of the way but right now, things are not

14   going very smoothly and I hope we do better next week.

15         Anything else that we need to talk about today?

16         MS. SAHARIA:  Your Honor, I just wanted to raise a

17   few logistical issues that I think resulted from the

18   conference that you had last week.

19         THE COURT:  Yes.

20         MS. SAHARIA:  So, first, you had asked about -- I

21   think you had given us your draft preliminary instructions.

22         THE COURT:  Yes.

23         MS. SAHARIA:  I just wanted to report we don't have

24   any objections.

25         THE COURT:  Yes.  I wasn't giving it to you for

71

1    objections.  That's what I always do.

2        MS. SAHARIA:  I just want to say they are written as

3    if it's a single defendant case.

4        THE COURT:  I will take care of that.

5        MS. SAHARIA:  Sure.

6        THE COURT:  You asked for what my -- this is my

7    standard.  I'm going to do things like change it to plural.

8        MS. SAHARIA:  Okay.

9        THE COURT:  What else?

10        MS. SAHARIA:  Okay.  You had asked about the Percoco

11    decision and whether that has any effect on the jury

12    instructions.

13        THE COURT:  Yes.

14        MS. SAHARIA:  I think the answer is they don't

15    materially change our submissions.

16        THE COURT:  Okay.

17        MS. SAHARIA:  We will submit a letter to Your Honor

18    that will be one page.

19        THE COURT:  You don't need a letter.  I have it on

20    the record.

21        MS. SAHARIA:  Great.

22        And just as an FYI, we are meeting and conferring

23    with the government about the joint statement of the case for

24    the voir dire.

25        THE COURT:  Actually, there was some description in

1  the proposed voir dire, so that could be the start, but if you

2  want to --

3          MS. SAHARIA:  We started with that and then we

4  proposed some revisions to that.

5          THE COURT:  That's fine.

6          MS. SAHARIA:  And then I think I expect there will

7  be some issues for us to address with the Court regarding the

8  protective order and sealing issues but we're going to address

9  it with the government in the first instance and come back to

10 the Court hopefully with an agreement and if not an agreement,

11 then we'll have to resolve it at some point in time.

12         THE COURT:  That's fine.

13         Anybody have anything else?

14         MR. POLEMENI:  No, Your Honor.

15         MS. SAHARIA:  No, Your Honor.

16         THE COURT:  I mean we're going to -- if there's some

17 time, if we're waiting for our jury to come up, we can cover

18 some of these other issues.  If not, we'll do it at a break or

19 at the end of the day, some of the open items but, hopefully,

20 I'll deal with them in the next couple of days.  Okay?

21         See you all on Tuesday.

22         MR. GRUBIN:  Thank you, Judge.

23         (Matter concluded.)

24

25