

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RCH:AXB/LAZ                                  *610 Federal Plaza*
F. #2022R01030                               *Central Islip, New York 11722*

                                             April 4, 2025

By ECF

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

            Re:    United States v. Devolder Santos
                   Criminal Docket No. 23-197 (S-2) (JS)

Dear Judge Seybert:

            The government respectfully submits this letter in connection with the sentencing of defendant George Anthony Devolder Santos, also known as "George Santos" (hereinafter, "Santos"). As set forth in the Presentence Investigation Report ("PSR"), Santos's advisory Guidelines range is 51 to 63 months' imprisonment plus a mandatory consecutive term of 24 months. (*See* PSR ¶ 159). The Probation Department has recommended an effective principal sentence of 75 months' custody (51 months on Count Two, followed by 24 months on Count Six). (*See* Sent'g Rec. dated 2/7/2025). For the reasons that follow, the government submits that an effective sentence of 87 months' custody (63 months on Count Two, followed by 24 months on Count Six) is necessary to achieve the goals of sentencing in this case.

    I.    Background

            During the 2020 and 2022 federal election cycles, Santos campaigned as a candidate for the U.S. House of Representatives. (*See* PSR ¶ 10). Although unsuccessful during the 2020 election cycle, Santos was elected on November 8, 2022, as the United States Representative for New York's Third Congressional District, which covers part of Queens and Nassau Counties. (*Id.*). Santos was sworn into office on January 7, 2023. (*Id.*).

    A.    Campaign-Related Fraudulent Schemes

            As Santos has now admitted, during the same period that he was campaigning for elective office, he planned and executed a series of fraudulent schemes that formed the basis for this criminal prosecution. *First*, on behalf of Santos's principal campaign committee,

Devolder-Santos for Congress (the "Committee"), Santos and his campaign treasurer-turned-coconspirator Nancy Marks submitted materially false reports to the Federal Election Commission ("FEC"), fraudulently inflating the Committee's fundraising numbers for the purpose of misleading the FEC, the National Republican Congressional Committee ("NRCC"), and the public (the "Party Program Scheme"). *Second*, Santos stole personal identity and financial information of individuals who had contributed to the Committee and used it to cause these individuals' credit cards to be charged repeatedly without authorization (the "Credit Card Fraud Scheme"). *Third*, Santos fraudulently induced supporters of his candidacy to contribute funds to Redstone Strategies LLC ("Redstone Strategies"), which he claimed was a Section 501(c)(4) social welfare organization and/or a Super PAC, only to convert those supporters' contributions to his own personal benefit (the "Redstone Strategies Fraud Scheme"). Each of these schemes is outlined more fully below.

1. The Party Program Scheme

The NRCC is a political committee that works to support members of the Republican Party in their campaigns for election to the U.S. House of Representatives. (PSR ¶ 12 n.1). In furtherance of those efforts, the NRCC operated the Young Guns program, which identified competitive candidates and "help[ed] equip [those] Republican candidates across the country with the tools they need to run winning campaigns." (*Id.* ¶ 13). The Young Guns program had three phases, each containing benchmarks that a candidate must achieve to advance to the next phase of the program. (*See id.* ¶¶ 13-14). To qualify for the first phase, Republican congressional candidates needed to simply submit an application. (*Id.* ¶ 14). To qualify for the second phase, those candidates needed to meet several criteria, including a district-specific fundraising goal, an agreed-upon campaign treasurer and compliance processes, and an agreed-upon finance team. (*Id.*). Candidates who qualified for the second phase are designated by the NRCC as "On the Radar." (*Id.*). For the third phase, the NRCC ultimately selected a subset of these "On the Radar" candidates as "Young Guns" and provided them with financing and campaign assistance. (*Id.*).

During the 2022 election cycle, Santos was a candidate for the U.S. House of Representatives, campaigning to be the United States Representative for New York's Third Congressional District, which covers parts of Queens and Nassau Counties. (PSR ¶ 10). For the Young Guns program, the NRCC set a district-specific fundraising goal for New York's Third Congressional District of $250,000 in a given quarter. (*Id.* ¶ 15). At the conclusion of the third quarter of 2021, the Committee failed to meet this fundraising goal. (*Id.*). When Santos asked why he had not qualified for the Young Guns program, his campaign staffers emphasized to him that the campaign could not qualify without meeting this $250,000 fundraising goal. (*Id.*). In a text message, Santos told his staff, "We are going to do this a little different. I got it." (*Id.*).

The fourth quarter reporting period was scheduled to end on December 31, 2021. (PSR ¶ 16). As the fundraising deadline approached, Santos repeatedly expressed concern that his campaign would (again) fall short of the NRCC's quarterly fundraising threshold. For example, on December 10, 2021, he told one associate that he was on "a mission" and "desperate for funds" "before December 31st."

2

On December 16, 2021, Santos and Marks traveled to Wichita, Kansas, on a fundraising trip. (*Id.*). While in Wichita, Santos continued to express concerns about hitting the fundraising threshold by quarter's end, writing to one associate that he was "on this deadline and it's creeping up really fast." On December 18, 2021, the last day of the trip, Santos wrote to another associate that "my fundraising goal creeped up on me and I need to make my goal." Later that day, Santos and Marks met in a hotel room and agreed to conceal the fundraising gap through fraud. Specifically, Santos and Marks agreed to report tens of thousands of dollars in fake campaign contributions to make it appear as though Santos had met the NRCC's fundraising threshold. (*Id.*). As Santos and Marks knew, the fake contributions had to be attributed to real people. Thus, they falsely reported that these fake contributions were made by family members of Santos and Marks, all without those individuals' knowledge or permission.[1] Having fabricated more than $55,000 in fundraising, Santos suddenly expressed newfound confidence—he texted one campaign staffer that the "[c]ampaign [had] hit $251," meaning it had exceeded the NRCC's district-specific fundraising goal of $250,000. Three days later, Marks texted Santos, "You never sent me list of donors – your family." (PSR ¶ 17). In response, Santos provided four pieces of personal information for each fake donor: the donor's name, address, occupation, and the amount purportedly contributed to Santos's campaign. (*Id.*). That information was not accidental: Santos knew that his campaign would be required to report those exact four items to the FEC. (*Id.*).

The Committee's 2021 fourth quarter-end filing was due on January 31, 2022. (PSR ¶ 19). On the due date, Santos repeatedly texted Marks to confirm that their filing would (falsely) report more than $250,000 in contributions, describing himself as "lost and desperate." (*Id.*). And in fact, the Committee's filing with the FEC did just that – it reported fundraising of $251,549.68 for the fourth quarter of 2021, using the false contributions, which elevated the overall tally just barely above the NRCC's threshold for Young Guns eligibility. (*Id.* ¶¶ 20, 22). That is, without $53,200 in fraudulently reported contributions, the defendant's campaign would have missed the critical requirement for qualification of the next phase of the Young Guns program. (*See* PSR ¶¶ 20, 22).

In February 2022, Santos and his campaign applied for the Young Guns program. (PSR ¶ 23). Santos's application not only relied on his fraudulent filing with the FEC but it also contained numerous lies about his biography—lies he had repeated elsewhere, including on his campaign website, in media interviews, and to potential campaign donors. (*Id.*). For example, Santos falsely claimed in the application materials to have graduated from New York University and to have worked at Citigroup and Goldman Sachs. (*Id.*). Santos personally signed the false Young Guns application. (*Id.*). At the end of February, based on these misrepresentations

---

[1]     The list of fake donations was contained in a text message from Santos to Marks and reflected their plan to falsely report to the FEC: (1) $5,800 contributions (the maximum allowable contribution amount) in the names of Santos's father, stepmother, half-sister, two aunts, and two uncles; and (2) $5,800 contributions in the names of Marks's mother, brother, and sister-in-law. (PSR ¶ 16). None of these contributions was ever made, nor did any of the conspirators' family members have the financial means to do so.

concerning Santos's profile and fundraising prowess, the NRCC announced that Santos had qualified for the second phase of the Young Guns program and was officially "On the Radar." (*Id.*).

Still competing for a place in the third phase of the Young Guns program, Santos remained fixated on the fundraising totals he reported to the FEC. (PSR ¶ 25). In early March 2022, he told an associate that his "back [was] against the wall this quarter," namely the first quarter of 2022. (*Id.*). Around the same time, Santos also complained to Marks that it had been "a bad quarter so far." But Santos's primary concern was not with raising sufficient campaign funds; rather, he merely wanted to convince the NRCC that he had done so, even if by fraud. Thus, in mid-March 2022, Santos texted one potential campaign donor: "I have a very important meeting at the end of this week with the NRCC. This meeting will decide if they will invest in my race & so we need to come in with very strong fundraising numbers. There are several million dollars on the line with this, and having your name as a contributor to my campaign would be a very great help." (PSR ¶ 26).

A few days later, at Santos's direction, his campaign made a "Path to Victory" presentation to the NRCC. (PSR ¶ 27). Parroting lies Santos had made to his own campaign staff, the presentation falsely indicated that Santos was loaning his campaign $500,000 in the first quarter of 2022 and that Santos had the "[p]ersonal and political capital that will allow for a fully-funded operation." (*Id.*). After the presentation, Santos continued to (falsely) tell campaign staff that he was loaning $500,000 to his campaign, including on March 30, 2022, when Santos told one staffer that the "Q1 loan" was "getting done tomorrow." (PSR ¶ 28).

That, too, was a lie. Santos never loaned $500,000 to his campaign. (PSR ¶ 28). Nor did he have the money to do so; at that time, Santos had less than $8,000 total in his personal and business bank accounts. (*Id.*). But other than Marks, who was complicit in Santos's fraudulent scheme, the campaign staff believed Santos's lies and relied upon them in performing their jobs. On April 13, 2022, for example, Santos's campaign issued a press release touting its impressive fundraising total of $800,000 for the first quarter of 2022, which, of course, relied heavily on this non-existent $500,000 loan. (PSR ¶ 29). To be sure, the fake loan constituted the majority of the $800,000 purportedly raised by the Committee in the first quarter of 2022. (*Id.*). The press release also boasted that Santos had qualified for the second phase of the Young Guns program, describing the feat as "a sign of . . . growing interest and belief in the competitiveness of this seat." (*Id.*). Santos personally approved that press release. He also amplified the reach of these false statements by posting about his fraudulent fundraising totals on social media and communicating with friends, associates, and potential donors about his fundraising success. For example, in a conversation with a sitting Congresswoman, Santos falsely stated, "I'm reporting 800k for the quarter. Raised 400k put 400k in."[2] Similarly, when another associate texted Santos, "dude wow $500k on 3/31!

---

[2] It is notable that Santos himself struggled to keep track of his many lies. In this text message to a Congresswoman, for example, Santos claimed that his non-existent loan to

Talk about self funding!" Santos responded, "I put my money where my mouth is.  Talk is cheap . . . lol."  To yet another associate, Santos stated, "[m]y primary priority now is my campaign and I'm putting 500k in."  And to a fourth associate, Santos reported that he could not donate to another campaign because, "I just gave myself $500k [and] I'm indisposed at the moment."

This lie was repeated yet again on April 15, 2022, when, at Santos's direction and on behalf of the Committee, Marks filed a quarter-end report with the FEC falsely indicating that Santos had loaned his campaign $500,000 on March 31, 2022.  (PSR ¶ 30).  Santos and Marks agreed to submit this false filing, knowing that the FEC, the NRCC, and the public would rely on its truth and accuracy.  (*Id.*).

They were right: relying on the various misrepresentations Santos and Marks had made in their filings with the FEC—together with the campaign's false and misleading "Path to Victory" presentation and various public lies about Santos's fundraising success—the NRCC announced that Santos had qualified as a "Young Gun" on June 14, 2022.  (PSR ¶ 31).  In short order, the NRCC began providing financial and logistical support to Santos's campaign, including access to certain joint fundraising agreements and joint fundraising committees.  (*Id.* ¶ 32).  One such committee, Take Back the House 2022 Joint Fundraising Committee, ultimately transferred more than $50,000 to Santos's campaign.  (*Id.*).  In addition, the NRCC contributed $5,000 directly to Santos's campaign, paid $103,000 for cable and digital advertising for the campaign, and contributed $33,000 towards the cost of a poll for the campaign.  (*Id.* ¶ 33).

As the election approached, members of Santos's campaign reviewed its bank statements and identified the glaring $500,000 discrepancy between the funds being reported to the FEC and the funds on hand.  (PSR ¶ 34).  When confronted, Santos acknowledged that he had not supplied the reported loan but gave various false and pretextual explanations for why he had not yet done so.  (*Id.*).  In the fall of 2022, Santos was forced to address the shortfall, given the campaign's intention to spend all its reported funds in advance of the election.  (*Id.* ¶ 35).  To bridge the gap, Santos approached Individual 1, an associate and campaign donor, and asked for a $450,000 loan, which Individual 1 agreed to provide.  (*Id.*).  At the time, Santos had less than $2,000 in his bank account.  (*Id.*).  In mid-September 2022, Individual 1 wired $450,000 to Santos; Santos then immediately wired $400,000 of those funds to his campaign.  (*Id.*).  He never reported those transactions to the FEC.  (*Id.*).  Unsurprisingly, Santos never repaid the loan.  And, brazenly, he bridged the remaining $100,000 shortfall using funds that he misappropriated from Individual 1 through Redstone Strategies as discussed *infra*.

2.  The Credit Card Fraud Scheme

Over the course of the 2022 election cycle, Santos obtained the credit card information for several campaign contributors, in particular Individual 2, Individual 3, and

---

the campaign was $400,000 after reporting to campaign staff, the NRCC, and the public that it was $500,000.

Individual 4, when they contributed to Santos's campaign.  (PSR ¶ 36).  Obtaining credit card information from a contributor is a commonplace occurrence for political candidates.  What Santos did with the information was not.  All three contributors are elderly persons suffering from some degree of cognitive impairment or decline: Individual 2 is 86 years old and has had challenges with memory loss; Individual 3 is 73 years old and suffered brain damage from a fall in 2014; Individual 4, 87 years old, was declared legally incapacitated with dementia in January 2021.  (PSR ¶ 47).  Santos preyed on these vulnerable victims, using their credit card information to repeatedly make unauthorized contributions to his own campaign, to other campaigns, and to his fake Super PAC Redstone Strategies, which, as described *infra*, Santos used as a personal piggy bank.  (*Id.*).  To conceal the true source of the stolen funds and to evade campaign contribution limits, Santos stole the identities of third parties and falsely attributed these fraudulent campaign contributions to those people.  (*Id.*).

Between July 2020 and October 2020, Santos used the misappropriated credit card information for Individual 4 to make $28,400 in campaign contributions to his campaign, disguising the fact that these contributions originated from the same source by masking them with stolen identities.  (PSR ¶ 42).  For example, at the end of October 2020, using Individual 4's stolen credit card information, Santos donated $2,800 to his own campaign.  (*Id.*).  He falsely reported to the FEC that the contribution had come from one of his personal friends.  (*Id.*).  That friend had not only *not* donated to Santos's campaign but also had never authorized Santos to publicly associate the friend's personal information with a fraudulent campaign contribution.

Similarly, between December 2021 and March 2022, Santos used the stolen credit card information for Individual 2 to make tens of thousands of dollars in contributions to his campaign and other campaigns, again disguising the source of the funds by masking them with either stolen identities or fictitious identities.  (PSR ¶ 41).[3]  Specifically, in late December 2021, Santos used Individual 2's stolen credit card information to contribute $5,000 to his campaign, falsely attributing the contribution to a personal friend.  (*Id.*).  In mid-February 2022, Santos used Individual 2's stolen credit card information to contribute $5,000 to another congressional

---

[3]      To be clear, Santos's use of stolen credit card information to contribute to other congressional campaigns was designed to financially benefit himself or his own campaign, albeit indirectly.  (PSR ¶ 43).  For example, Santos had entered into "donor swaps" whereby he and other candidates would arrange for one of their respective supporters to contribute to the congressional campaign of the other.  (*Id.* ¶ 44).  In some instances, to fulfill his end of these bargains—and thus ensure a reciprocal contribution to his own campaign—Santos used stolen credit card information to make unauthorized contributions to other congressional campaigns.  (*Id.*).  Santos also used stolen credit card information to contribute to other congressional campaigns because those campaigns were "clients" of Redstone Strategies, his shell company and fraud vehicle.  (*Id.* ¶ 45).

campaign, falsely attributing the contribution to a fictitious person. (*Id.*).[4] At the beginning of March 2022, Santos used Individual 2's stolen credit card information to donate $5,800 to another congressional campaign, falsely attributing the contribution to a fictitious person. (*Id.*).[5] Also in early March 2022, Santos used Individual 2's stolen credit card information to donate $10,800 to his own campaign, falsely attributing the contribution to a fictitious person. (*Id.*). In mid-March 2022, Santos used Individual 2's stolen credit card information to donate $11,800 to a congressional campaign, falsely attributing the contribution to a fictitious person. (*Id.*).[6] And at the end of March 2022, Santos used Individual 2's stolen credit card information to donate $5,000 to another congressional campaign, falsely attributing the contribution to Santos's uncle. (*Id.*).[7]

In December 2021, Santos obtained Individual 3's credit card information when Individual 3 texted that information to Santos and Marks for the purpose of authorizing a one-time contribution to Santos's campaign. (PSR ¶ 38). That same day, however, Santos used Individual 3's credit card information to make a second, unauthorized contribution to his campaign, falsely attributing the contribution to Santos's sister in filings with the FEC. (*Id.*). Between February 2022 and August 2022, Santos repeatedly used Individual 3's stolen credit card information to make contributions to his own campaign and to other congressional campaigns. (*Id.* ¶ 40). In early February 2022, Santos used Individual 3's stolen credit card information to contribute $5,800 to another congressional campaign, falsely attributing the donation to himself. (*Id.*).[8] In mid-February 2022, Santos used Individual 3's stolen credit card information to contribute $5,000 to another congressional campaign, falsely attributing the donation to a fictitious person. (*Id.*).[9] At the end of March 2022, Santos used Individual 3's stolen credit card information to contribute to

---

[4]    The beneficiary of this fraudulent contribution was a "client" of Redstone Strategies, and Redstone Strategies earned a commission of $2,000 on this transaction. (PSR ¶ 45).

[5]    The beneficiary of this fraudulent contribution was also a "client" of Redstone Strategies, and Redstone Strategies again earned a commission on this transaction. (*Id.*).

[6]    The beneficiary of this fraudulent contribution was also a "client" of Redstone Strategies, and Redstone Strategies again earned a commission on this transaction. (*Id.*).

[7]    The beneficiary of this fraudulent contribution was also a "client" of Redstone Strategies, and Redstone Strategies again earned a $1,000 commission on this transaction. (*Id.*).

[8]    This fraudulent transaction was made as part of an agreed-upon donor swap between Santos's campaign and the other congressional campaign. (*Id.* ¶ 44). Thus, by misusing Individual 3's identity and personal information in this way, Santos ensured a reciprocal contribution to his own campaign.

[9]    The beneficiary of this fraudulent contribution was also a "client" of Redstone Strategies, and Redstone Strategies earned a commission of $2,000 on this transaction. (*Id.* ¶ 45).

another congressional campaign, attributing the donation to Individual 3, without Individual 3's knowledge or consent. (*Id.*).[10]  At the end of April 2022, Santos used Individual 3's stolen credit card information in an attempt to donate $5,800, but the transaction was declined. (*Id.*).  Santos falsely attributed this attempted contribution to a close personal friend of Individual 3. (*Id.*).  At the end of June 2022, Santos used Individual 3's stolen credit card information to donate $5,800 to another congressional campaign, falsely attributing the donation to Individual 3, without Individual 3's knowledge or consent. (*Id.*).[11]  At the beginning of August 2022, Santos used Individual 3's stolen credit card information to attempt to donate $5,800, but the transaction was declined. (*Id.*).  Santos attempted to falsely attribute this contribution to the daughter of the victim, Individual 3. (*Id.*).  That same day, using Redstone Strategies' merchant account, Santos charged $12,000 on Individual 3's credit card, again without Individual 3's knowledge or authorization. (*Id.* ¶ 46).  After the collection of processing fees, Redstone Strategies received $11,651.70 into its bank account and, that same day, Santos transferred $11,580 of those stolen funds to his personal bank account—a naked theft from a 78-year-old woman with a brain injury. (*Id.*).  When Santos's business partner confronted him, Santos lied and claimed that Individual 3 was Santos's consulting client and that the funds were a consulting fee that he earned. (*Id.*).

3.  The Redstone Strategies Fraud Scheme

In November 2021, Santos and an associate incorporated Redstone Strategies as a political consultancy business, agreeing to share the profits from the business equally and opening bank accounts at Wells Fargo Bank. (PSR ¶ 51).  Shortly thereafter, Santos withdrew from the business to focus on his congressional campaign but remained an authorized signatory with access to those accounts. (*Id.* ¶ 52).  Over the first half of 2022, the operations of Redstone Strategies slowed to a halt, and, by September 2022, Redstone Strategies was inactive and essentially defunct, having no clients and performing no services. (*Id.* ¶ 53).

At the same time, Santos's congressional campaign was gearing up for the November 2022 election.  In early September 2022, Santos contacted one of his former campaign managers, Individual 5, whom Santos knew was seeking work. (PSR ¶ 54).  Santos told Individual 5 that Redstone Strategies was an independent, Section 501(c)(4) organization supporting his

---

[10]    This fraudulent transaction was made as part of an agreed-upon donor swap between Santos's campaign and the other congressional campaign. (*Id.* ¶ 44).  Thus, misusing Individual 3's identity and personal information in this way, Santos ensured a reciprocal contribution to his own campaign.

[11]    This fraudulent transaction was made as part of an agreed-upon donor swap between Santos's campaign and the other congressional campaign. (*Id.*).  Thus, misusing Individual 3's identity and personal information in this way, Santos ensured a reciprocal contribution to his own campaign.

congressional campaign through television advertising.[12]  None of that was true.  Because Santos controlled its bank accounts, Redstone Strategies was not an independent organization in any sense; Redstone Strategies never registered as a Section 501(c)(4) organization with the IRS; and Redstone Strategies never performed any services for Santos's congressional campaign.  (*Id.* ¶¶ 51, 53).  Santos also told Individual 5 that several other persons operated Redstone Strategies—another lie.  Although Santos's business partner was a co-signer on Redstone Strategies' bank accounts, that person did not operate the business; in fact, no one was performing any work for Redstone Strategies by September 2022.  In truth, Redstone Strategies had become essentially a shell company with bank accounts that Santos could access.  Santos told Individual 5 that Redstone Strategies would pay him $6,000 to solicit contributions for the organization during the two months before Election Day.  (*Id.* ¶ 54).

Once Individual 5 agreed, Santos immediately put him to work soliciting donations to Redstone Strategies, which Santos then embezzled into his own personal bank accounts.  (PSR ¶¶ 48-49).  On September 12, 2022, Santos sent Individual 5 the wire information for Redstone Strategies' bank account and contact information for three prospective donors: Individual 1, Individual 6, and Individual 7.  (*Id.* ¶ 55).  Santos told Individual 5 that Individual 1 had already agreed to donate $100,000 and that Individual 6 and Individual 7 had both already agreed to donate "in the six figures" to Redstone Strategies.  (*Id.*).  More lies.  Individual 6 and Individual 7 had never heard of Redstone Strategies, let alone agreed to make such donations.  (*Id.*).  To spur Individual 5 to action, Santos impressed upon him that the solicitations were "extremely time sensitive" and needed to be taken "serious."  (*Id.*).  Individual 5 then reached out to Individual 1 to request a $100,000 contribution.  (*Id.* ¶ 56).  After Individual 5 contacted Individual 6, he relayed to Santos that Individual 6 "had no clue what I was talking about" and had "never heard of Redstone."  (*Id.* ¶ 55).

To educate the donors on Redstone Strategies, Santos directed Individual 5 to prepare a one-page summary of the organization.  Because Individual 5 knew nothing about Redstone Strategies other than what Santos had told him, he asked Santos for more information.  Santos replied that Redstone Strategies was "a small C4 just to help this race. Nothing else."  (PSR ¶ 56).  He then reiterated: "No limits. C4." (*id.* ¶ 55), meaning Redstone Strategies was not constrained by the campaign contribution limits established by federal law and could accept unlimited donations.  After Santos approved the one-pager on Redstone Strategies, Individual 5 emailed Individual 6, relaying Santos's misrepresentation that Redstone Strategies was a "501(c)(4) political organization formed specifically to influence the [defendant's] election."  (*Id.*).  Around the same time, Santos also contacted Individual 6 to solicit hundreds of thousands of

---

[12]    A Section 501(c)(4) organization is a non-profit organization registered with the Internal Revenue Service ("IRS") and operating exclusively for the promotion of social welfare.  *See* 26 U.S.C. § 501(c)(4).  A Section 501(c)(4) organization may engage in political activity so long as the political activity is not its primary activity.  Significantly, Section 501(c)(4) organizations may accept unlimited corporate and personal donations but are not required to provide their donor information to the IRS.

dollars on behalf of Redstone Strategies, (which he falsely described as a political action committee) to fund television advertisements. (*Id.* ¶ 57).

Two weeks later, with no contributions made to date, Santos urged Individual 5 to make solicitations to Individual 1 and Individual 6 again. (PSR ¶ 58). A few days later, Individual 5 relayed that Individual 1 had agreed to wire a contribution to Redstone Strategies. (*Id.*). By October 4, 2022, Santos complained to Individual 5 that Redstone Strategies had not received the promised contribution from Individual 1, directed Individual 5 to follow up with Individual 1, and identified two new prospective donors to solicit: Individual 8 and Individual 9. Santos directed Individual 5 to (falsely) tell the prospective donors that Redstone Strategies had "already raised $800k but need[ed] another $700k to round it off and be competitive." (*Id.* ¶ 59). Yet again, Santos was lying. Redstone Strategies had raised no money. In fact, at the time Santos sent this message, Redstone Strategies had just $5.00 in its bank accounts. (*Id.* ¶¶ 59-60).

Later that day, Individual 5 contacted Individual 1 again, after which Individual 1 wired $100,000 to Redstone Strategies. (PSR ¶ 60). Immediately afterwards, Santos accessed a bank account for Redstone Strategies and wired the $100,000 contribution to his personal bank account, thereby embezzling the money. (*Id.*). On October 14, 2022, Santos wired the same $100,000 into the Committee's account, thus creating the false impression that he was contributing his own funds to the campaign and, in the process, disguising the true source of the money.

Meanwhile, at Santos's instruction, Individual 5 sent repeated solicitations to Individual 8 on October 4, 2022, October 17, 2022, October 20, 2022, and October 24, 2022. (PSR ¶ 61). Unknowingly relying on Santos's lies, Individual 5 misrepresented to Individual 8 that Redstone Strategies had already raised $800,000, that it was a Section 501(c)(4) social welfare organization, and that it would use the raised funds for television advertisements; Individual 8 nevertheless declined to contribute. (*Id.*). Individual 5 made these same misrepresentations to Individual 9, again in reliance upon Santos's falsities. (*Id.* ¶ 62). Specifically, on October 12, 2022, Santos directed Individual 5 to contact Individuals 6 through 9 for donations. (*Id.* ¶ 63). In turn, Individual 5 sent new solicitations to Individual 7 and Individual 9, again conveying Santos's lies that Redstone Strategies was a Section 501(c)(4) organization that had already raised $800,000 and that would spend every dollar raised on supporting Santos's election. (*Id.*).

When Individual 5 complained that he had not been paid for his efforts, Santos continued to maintain the illusion that someone else was operating Redstone Strategies and that Santos had no control over the company's payments to Individual 5, writing: "I can't do much more than just nudge . . . There are lines. They will do it. Just give them until Monday and if anything I'll yell at them myself." (PSR ¶ 64). The next day, Santos doubled down on that lie, describing for Individual 5 a fake argument he claimed to have had with (nonexistent) Redstone Strategies employees because Santos "was told yesterday you were [paid]." (*Id.* ¶ 65). Santos

10

then logged onto Redstone Strategies' bank accounts and wired wages to Individual 5. (*Id.*).[13] Santos continued lying to Individual 5, falsely claiming that Redstone Strategies had received $750,000 in donations from two prominent wealthy donors whom he identified by name. (*Id.*). No such donations had been made.

On October 20, 2022, Individual 5 again contacted Individual 7 and Individual 9, repeating Santos's lies that Redstone Strategies intended to run television advertisements in support of Santos's candidacy, that it needed to raise a total of $1.5 million for that purpose, and that Redstone Strategies had each of these donors "down for a $100,000 contribution." (PSR ¶ 66). The next day, Santos personally repeated similar lies, telling Individual 7, "I'm needing some help on the outside [*i.e.*, through a political action committee operating independently of his campaign Committee] for next week on TV. Can I have the guys from the outside give you a buzz? Can you help? It's coming down to the wire and these people are on me." (*Id.* ¶ 67). After sending this message to Individual 7, Santos told Individual 5 to solicit a donation from Individual 7, as well as from an additional donor: Individual 10. (*Id.*). Of Individual 10, Santos told Individual 5 to "[c]all this guy too. Strong push to him. You can probably get $25k. If you try hard." (*Id.*). Individual 5 emailed Individual 10 for a donation, again conveying the misrepresentation that Redstone Strategies was a "501(c)(4) independent expenditure committee . . . exclusively supporting [Santos] in the race for Congress." (*Id.*). Individual 10 declined to contribute. (*Id.*).

On October 21, 2022, based on the falsehoods pushed by Santos, Individual 7 wired $25,000 to Redstone Strategies. (PSR ¶ 67). Contrary to the purported purpose of that entity, Santos immediately accessed Redstone Strategies' bank accounts and wired the money into his personal bank accounts. (*Id.*). Four days later, Santos directed Individual 5 to again solicit donations from Individual 8 and Individual 9. (*Id.* ¶ 68). In doing so, Santos again falsely stated that Redstone Strategies "need[ed] to make the [television advertising] buy [on] Thursday. This is cutting [it] very close. Need you to get a little more aggressive. [Individual 9] and [Individual 8]. They are good for it. Just require the push." (*Id.*). In turn, Individual 5 relayed that message to Individual 9, saying that Redstone Strategies was "down to the wire and our deadline to purchase ads supporting [Santos] is here." (*Id.*).

On October 26, 2022, Santos and Individual 5 discussed additional efforts to solicit donations to Redstone Strategies. (PSR ¶ 69). Despite having stolen $25,000 from Individual 7 just five days earlier and knowing full well that he would likewise steal any future payments, Santos expressed disappointment in Individual 5's perceived lack of effort: "I can't believe I'm arguing a time sensitive donation with you. Very disappointed." (*Id.*). That same day, Individual 9 wired $25,000 to Redstone Strategies. (*Id.*). As he had before, Santos immediately accessed Redstone Strategies' bank accounts and wired that money into his personal bank account. (*Id.*).

---

[13] This episode plainly begs the question whether Santos ever would have compensated Individual 5 for his work if Individual 5 had never complained.

In the ensuing days, Santos tried to solicit additional donations from Individual 6 directly. (PSR ¶ 70). On November 1, 2022, to that end, Santos told Individual 6 that Redstone Strategies was "just waiting to chat with [Individual 6] to secure what they have to do," that is, to purchase television advertising. (*Id.*). The next day, Santos tried again, writing to Individual 6: "Can you please talk to the guys on the other side [i.e., Redstone Strategies], if you are able too [sic]. They made the [television advertising] reservation yesterday and have to pay today to go live with their blitz they are just waiting on you." (*Id.*). The day after that, Santos tried again: "Hey if you can and have time they paid partial yesterdays and can do the rest today." (*Id.*). These repeated entreaties were wholly fabricated—no television advertising reservations had been made, no television blitz was planned, no partial payment had been made, no bill was coming due. Rather, Santos simply continued to lie to part Individual 6 from his money.

Santos also continued to mislead Individual 5. In early November 2022, when Individual 5 again complained about not getting paid, Santos falsely claimed to have "followed up . . . yesterday. Please bare [sic] with me I can't control that and if I keep pushing desperately it just makes you look desperate with these folks. Everyone if [sic] focused on Election Day. Hang tight . . . I don't control [payment] stop trying to make me feel bad." (PSR ¶ 71). In truth, Santos had not "followed up" with anyone because no one worked at Redstone Strategies and Santos, in fact, did control payments. (*Id.*). A few days later, after Individual 5 again vented his frustrations, Santos kept up the lie: "I've called 3 times. No one answered me they are all going nuts it's Election Day." (*Id.*). None of this, in fact, had happened. Individual 5 was finally paid on November 10, 2022.

After defrauding Individual 7 and Individual 9 of a combined $50,000, Santos spent their money on frivolous luxuries, including staying at the Venetian Hotel in Las Vegas and purchases at designer retailers like Hugo Boss, Hermès, Louis Vuitton, Brooks Brothers, and Macy's. (PSR ¶ 73). He sent stolen money to his husband and sister and withdrew thousands of dollars in cash for himself. (*Id.*). He paid down personal credit card bills, car loans, and debts. (*Id.*). He did not spend a single dollar on television advertising for his campaign. (*Id.*).

B. Employment-Related Fraudulent Schemes

1. Fraudulent Application for and Receipt of Unemployment Benefits

In March 2020, in response to the COVID-19 pandemic rapidly spreading throughout the country, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). (PSR ¶ 74). The CARES Act allocated additional unemployment benefits for eligible individuals through two federally funded programs: (a) Pandemic Unemployment Assistance (PUA); and (b) Federal Pandemic Unemployment Compensation (FPUC). (*Id.*). The New York State Department of Labor ("NYS DOL") administered these programs in New York State. (*Id.*). To be eligible for unemployment benefits, qualified workers needed to be unemployed through no fault of their own and ready, willing, and able to accept a job. (*Id.* ¶ 75). PUA and FPUC provided urgently needed assistance to the millions of people who lost their jobs during the pandemic.

Santos was not among those people.  In fact, in February 2020, Santos obtained a high-profile job as the Regional Director of Harbor City Capital ("Harbor City"), an alternative investment firm later alleged by the U.S. Securities and Exchange Commission ("SEC") to be a Ponzi scheme.  (PSR ¶¶ 78, 81).  Harbor City even issued a press release announcing Santos's hiring.[14]  As Regional Director, Santos earned $7,000 per month, receiving regularly scheduled bimonthly deposits into his personal bank account.  (*Id.* ¶ 78).  Santos worked at Harbor City until April 2021, maintaining his employment throughout the worst of the COVID-19 pandemic.  (*Id.*).

Despite being gainfully employed, on June 17, 2020, Santos submitted an online application for unemployment benefits to the NYS DOL.  (PSR ¶ 76).  In that application, Santos falsely claimed that he had been unemployed since March 17, 2020.  (*Id.*).  He falsely claimed that his workplace had been shut down due to the COVID-19 pandemic but that he was otherwise willing and able to work right away.  (*Id.*).  From that point forward—for 64 weeks in a row—Santos falsely reaffirmed his continuing eligibility to receive unemployment insurance benefits, until September 5, 2021.  (*Id.*).  In each weekly certification, Santos lied about not working, despite continuing to be paid by Harbor City as its Regional Director.  (*Id.*).

Between June 18, 2020, and September 7, 2021, as a direct result of Santos's fraudulent representations, the NYS DOL deposited tens of thousands of dollars in PUA and FPUC funds (all of which were federally funded) into Santos's personal bank account.  (PSR ¶ 77).[15]  In total, Santos unlawfully obtained $24,744 in unemployment insurance payments through patently false attestations.  (*Id.* ¶ 78).

2.  <u>False Statements in Financial Disclosure Statements to the U.S. House of Representatives</u>

As a candidate for the U.S. House of Representatives in 2020 and 2022, Santos was legally required to file a Financial Disclosure Statement prior to each general election.  (PSR ¶ 79).  The Financial Disclosure Statements required Santos to make a "full and complete statement" disclosing, among other things: (a) "his assets and income, transactions, liabilities, positions held and arrangements and agreements"; (b) "the source, type, and amount or value of income . . . from any source (other than from current employment by the United States Government)"; and (c) "the source, date, and amount of honoraria from any source, received for the year of filing and the preceding calendar year."  (*Id.*).  Further, Santos was required to certify that each Financial Disclosure Statement was "true, complete, and correct to the best of my knowledge and belief."

---

[14]   See *City Capital: Harbor City Capital Corp Introduces New Team Member*, MARKETSCREENER (July 17, 2020), *available at* https://www.marketscreener.com/quote/stock/CITY-CAPITAL-CORPORATION-120789343/news/City-Capital-Harbor-City-Capital-Corp-Introduces-New-Team-Member-30941800/ (last visited Apr. 1, 2025).

[15]   Notably, Santos arranged for these fraudulently obtained unemployment insurance benefits to be deposited into a *different* personal checking account than the account into which his employer, Harbor City, deposited his biweekly paycheck.

13

(*Id.*). Santos was aware that knowingly and willfully falsifying a Financial Disclosure Statement constituted a criminal violation of Title 18, United States Code, Section 1001. (*Id.*). Nonetheless, Santos repeatedly submitted Financial Disclosure Statements that were rife with lies and material omissions, which he certified were "true, complete, and correct to the best of [his] knowledge and belief." (*Id.* ¶ 84).

On May 11, 2020, during his 2020 campaign, Santos filed two Financial Disclosure Statements. (PSR ¶ 80). In those Financial Disclosure Statements, Santos certified that: (a) for the calendar year of 2019, he had earned $55,000 from LinkBridge Investors; and (b) for the calendar year of 2020 to date (*i.e.*, January 1, 2020 through May 11, 2020), he had not earned income from any source. (*Id.* ¶ 80). Those representations were false. In fact, Santos had earned only $27,555 from LinkBridge Investors in 2019. (*Id.* ¶ 81). And Santos intentionally failed to disclose that he had been gainfully employed by Harbor City Capital Corporation throughout 2020, earning approximately $25,403. (*Id.*). The upshot of this omission was twofold: it concealed Santos's financial relationship with a company that the SEC subsequently alleged was a Ponzi scheme and it maintained the fiction that he was unemployed throughout 2020, a misrepresentation that Santos put forth in his application for unemployment insurance benefits to the NYS DOL just one month later in June 2020. (*Id.*).

After losing the 2020 election, Santos upped the ante, including additional and far more brazen lies in his Financial Disclosure Statement filed in September 2022. *First*, Santos reported that, during the calendar year of 2021, he had earned $750,000 in salary and between $1,000,001 and $5,000,000 in dividends, both from his wholly owned company the Devolder Organization LLC (the "Devolder Organization"). (PSR ¶ 82). That was not true. During the calendar year of 2021, a total of $70,000 was deposited into the Devolder Organization's bank accounts, and less than $3,000 of those funds were ever transferred to Santos's personal bank accounts. (*Id.* ¶ 83). And Santos's disclosure intentionally omitted the income he had actually earned in 2021, namely $28,107 from Harbor City Capital (the firm alleged to have operated a Ponzi scheme) and $20,304 from the NYS DOL (the unemployment insurance benefits that Santos fraudulently obtained). (*Id.*).

*Second*, Santos similarly reported that, during the calendar year of 2022 to date (*i.e.*, January 1, 2022 through September 6, 2022), he had earned $750,000 in salary and between $1,000,001 and $5,000,000 in dividends, both from the Devolder Organization. (PSR ¶ 82). Once again, those representations—made under criminal penalties—were intentional and bald-faced lies. In fact, between January 1, 2022 and September 6, 2022, Devolder Organization had deposits totaling $27,000, and only $67,000 had been transferred to Santos's personal bank accounts (this included funds originally obtained by the Devolder Organization in the preceding year). (*Id.* ¶ 83). Moreover, Santos claimed in the 2022 Financial Disclosure Statement that he owned a checking account containing between $100,001 and $250,000 and a savings account containing between $1,000,001 and $5,000,000. (*Id.* ¶ 82). In truth, Santos's checking accounts contained a total of $9,000 on the date he filed the Financial Disclosure Statement, and he did not own a savings account. (*Id.* ¶ 83). Despite being readily disproved, these falsehoods served a larger purpose for Santos—as discussed more fully below, they contributed to his cultivation of a fictitious public

14

image, in which he was a highly educated, independently wealthy businessman. As his guilty plea in this case makes clear, however, the façade was disguising a professional fraudster.

## II.   U.S. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation of the total offense level as calculated in the PSR, set forth below:

### Count Two and Stipulated Criminal Conduct (Counts 9, 14, 19, and 23)

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Plus: Loss Between $250,000 and $550,000<br>(U.S.S.G. § 2B1.1(b)(1)(G)) | +12 |
| Plus: Misrepresentation Concerning Charitable/Political Organization<br>(U.S.S.G. § 2B1.1(b)(9)(A)) | +2 |
| Plus: Vulnerable Victims<br>(U.S.S.G. § 3A1.1(b)(1)) | +2 |
| Plus: Abuse of Position of Trust<br>(U.S.S.G. § 3B1.3) | +2 |
| Plus: Organizer, Leader, Manager, or Supervisor<br>(U.S.S.G. § 3B1.1(c)) | +2 |
| Less: Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1) | -3 |
| Total: | 24 |

(PSR ¶¶ 97-115).

### Count Six (Aggravated Identity Theft)

Under U.S.S.G. § 2B1.6(a), the guideline sentence is the minimum term of imprisonment required by statute, to wit: 24 months. *See* 18 U.S.C. § 1028A(a)(1).

(PSR ¶¶ 107, 158).

Based on a total offense level of 24 and Criminal History Category of I, Santos's advisory Guidelines range on Count Two is 51 to 63 months' imprisonment. (PSR ¶¶ 99-106, 113-15, 118, 159). However, because the Guidelines recommend, and the statute requires, that the

sentence for Count Six be 24 months, to run consecutive to all other counts, the effective Guidelines range is 75 to 87 months of imprisonment.

On March 28, 2025, Santos submitted to the Probation Department objections contesting the PSR's calculation of the Sentencing Guidelines. Santos argued that (1) the two-level organizer/leader enhancement under U.S.S.G. § 3B1.1(c) should not apply because Marks devised the scheme; and (2) the two-level vulnerable victim enhancement under Section 3A1.1(b)(1) should not apply because "the government did not establish that Mr. Santos knew or should have known about the victims' vulnerabilities at the time of the offense." He subsequently advised the government that he was withdrawing his objection to the vulnerable victim enhancement. With respect to the Section 3B1.1(c) organizer leader enhancement, Santos is wrong; the PSR correctly the enhancement.

### A.   The Leadership Role Enhancement was Properly Applied

The PSR correctly applied the two-level enhancement for being an organizer, leader, manager, or supervisor in the criminal activity under Section 3B1.1(c). "Determining whether a defendant's role in an offense constitutes that of an organizer or leader requires that we examine the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States v. Si Lu Tian*, 339 F.3d 143, 157 (2d Cir. 2003); *see also* U.S.S.G. § 3B1.1 Appl. Note 4. While each of these factors supports application of the two-point enhancement here, "[e]vidence of a defendant's direct and immediate control over participants obviously provides the strongest support for any aggravating role enhancement." *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995).

Where a defendant is the leader or executive of an organization that served as the locus of criminal activity, courts routinely—if not automatically—impose a leadership enhancement. Indeed, in such circumstances, the Second Circuit has remanded where the district court refrained from applying a leadership enhancement. *See United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (vacating and remanding where district court did not impose a role enhancement where defendant owned a car dealership through which a money laundering scheme was run); *United States v. Huerta*, 371 F.3d 88, 92 (2d Cir. 2004) (remanding for the district court to make additional findings as to application of a leadership role enhancement where the district court was "inappropriately dismissive of the significance of [the defendant's] role as the president of . . . the company through which" the crime was accomplished); *see also United States v. Duncan*, 42 F.3d 97, 105-06 (2d Cir. 1994) (applying leadership role enhancement to president of corporation that was the primary vehicle through which corrupt payments were made); *United States v. Rajaratnam*, No. 09 CR 1184, 2012 WL 362031, at *15 (S.D.N.Y. Jan. 31, 2012) (applying leadership enhancement where manager of hedge fund supervised hedge fund employees and was actively involved in conspiracy); *cf. United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003) (role adjustment should not be automatically imposed on business executives).

As the candidate, Santos was necessarily the leader of his congressional campaign. He hired Marks as campaign treasurer and other campaign staff, and clearly exercised control and authority over them. *See United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir. 2000) (affirming

district court's application of four-point leadership enhancement where candidate directed his girlfriend to make a sham contribution to his campaign and to find others willing to do the same). Santos had the ability to fire Marks and was the final decisionmaker for the campaign. *See Huerta*, 371 F.3d at 93 ("hiring and firing" control is a factor that supports application of a role enhancement). And as the candidate, Santos *alone* stood to profit from the fraud through NRCC financial and logistical support for *his* campaign, so that *he* could become a U.S. Congressman. By contrast, Marks, his co-conspirator, received no such corresponding benefits, only the ability to continue being employed by Santos. Santos's exercise of final decision-making authority is reflected in the text message activity surrounding the Committee's Year-End 2021 Report to the FEC, including the fact that Santos sent the names and false contribution amounts to Marks (*id.* ¶ 16), that Marks solicited additional information and took direction from Santos in the days that followed (*id.* ¶ 17), and that Marks ultimately entered false information into the Committee's Year-End 2021 Report to the FEC that was supplied by Santos (PSR ¶ 17-20 ("The Year-End 2021 Report contained the false donation information previously provided [Santos] to Marks.")). That is, Santos dictated the content of the false information he wanted Marks to enter into the Committee's FEC filing and Marks followed his directions. The Court should apply the two-point enhancement because Santos plainly supervised and managed Marks, at the very least. Courts have routinely applied this enhancement in similar circumstances. *See United States v. Kelsey*, No. 3:21-cr-00264, Doc. No. 157 at 22 (M.D. Tenn. Aug. 21, 2023) (applying two-level leadership enhancement where defendant was a federal political candidate who pleaded guilty to campaign finance offenses related to his campaign); *United States v. Courtright*, 460 F. Supp. 3d 545, 552 (M.D. Pa. 2020) (finding four-level leadership enhancement under § 3B1.1(a) for political candidate "appropriate" given "he stood to receive the fruits of the crimes in form of both cash and contributions to his campaign"); *United States v. Spencer*, 799 F. App'x 120, 123 (3d Cir. 2020) (upholding a four-level enhancement under § 3B1.1(a) in light of "extensive evidence" that the defendant, a former mayor, "directed and approved his staff's unlawful activities").

III.   Argument

    A.   Analytical Framework

      "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).[16] Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 50.

---

      [16]    Unless otherwise noted, all case quotations omit internal quotation marks and citations and accept alterations.

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and Santos's history and characteristics;

(2) the need for the sentence imposed—

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct; [and]

    (C)    to protect the public from further crimes of Santos.

"[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider."  *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988).  Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  Thus, the Court must first calculate the correct Guidelines range and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B.   Sentencing Recommendation

   1.   Santos's Crimes Are Numerous and Serious—A Significant Sentence Is Needed to Promote Respect for the Law and Provide Just Punishment

A top of the Guidelines' sentence is necessary to accurately reflect the seriousness of Santos's unparalleled crimes.  Santos planned and executed an assortment of fraudulent schemes and leveraged them and a fictious life story to enrich himself and capture one of the highest offices in the government of the United States.  He lied to his campaign staff, his supporters, his putative employer and congressional colleagues, and the American public.  Santos's conduct has made a mockery of our election system.  From his creation of a wholly fictitious biography to his callous theft of money from elderly and impaired donors, Santos's unrestrained greed and voracious appetite for fame enabled him to exploit the very system by which we select our representatives.

Despite his belated claims of remorse, Santos's conduct throughout this case has added insult to injury.  Faced with overwhelming evidence of guilt and a chorus of calls to resign,

Santos remained unrepentant and defiant, lambasting the prosecution as a "witch hunt," casting himself as a victim of government overreach, and refusing to step down from the position he obtained following a campaign premised on lying, cheating, and stealing. A significant carceral sentence is needed to reflect the breadth, scope, and predatory nature of Santos's crimes.

Against that backdrop, moreover, Santos's post-plea claims of remorse ring hollow. As of this writing, despite years of actively courting media attention and capitalizing on his infamy, Santos has forfeited nothing of his ill-gotten gains and has not repaid one cent to any of the victims of his financial crimes. The Court can and should find that this fact "demonstrate[s] a strong risk of recidivism and a lack of remorse for his conduct." *United States v. Dacy*, 301 F. App'x 45, 46 (2d Cir. 2008).

2. <u>Santos's History and Characteristics Are Extremely Troubling and Call for A Significant Carceral Sentence</u>

Santos's history and characteristics are troubling in the extreme. Santos is a pathological liar and fraudster. For years, Santos manufactured and promoted a fictionalized biography, one that depicted himself as a highly educated, independently wealthy, successful businessman, all premised on a heap of lies.

The government's investigation uncovered extensive evidence of Santos's fabricated past. He falsely asserted associations with venerable institutions and organizations in a cynical effort to trade off their reputations to bolster his own. He claimed to have graduated from Bernard M. Baruch College ("Baruch College") *summa cum laude* with a bachelor's degree in finance and economics. But he never attended Baruch College, let alone graduated with high honors. He claimed to have graduated from New York University's Stern School of Business ("NYU Stern") with a Master of Business Administration degree ("MBA"). He never attended or graduated from NYU Stern, either. He claimed that he worked at Citigroup as an Associate Asset Manager and as a Project Manager at Goldman Sachs. In truth, he never worked at either firm in any capacity. Santos claimed to be a real estate mogul, owning (along with his family) numerous properties throughout Queens County, Nassau County, and Suffolk County. In truth, neither Santos nor his immediate family members owned any such real estate. He claimed that his family firm, the Devolder Organization, had tens of millions of dollars in assets under management. As already discussed, that was another bald-faced lie.

The volume of Santos's lies and his extraordinary pattern of dishonesty speaks to his high likelihood of reoffending and the concomitant need to remove him from the community he has repeatedly victimized. The government's investigation uncovered evidence that Santos was propagating his manufactured biography at least as far back as 2017, when he told his employer, LinkBridge Investors, that he had previously worked at Citigroup and Goldman Sachs. Santos also indiscriminately spread these lies, repeating them to campaign staffers, consultants, contributors, and the leadership of the Republican Party, all of whom were helping him to get elected. He broadcast them on his campaign website, in national and local media interviews, and on social media.

Again speaking to Santos's insatiable appetite for attention, his lies grew in the telling and he fabricated more audacious details along the way. For example, in a radio interview in October 2020, he claimed that he attended Baruch College on an athletic scholarship for volleyball; that Baruch College's volleyball team had defeated Harvard and Yale and had been "champions across the entire Northeast corridor"; and that afterwards he had been forced to have knee replacement surgery due to the wear and tear of his athletic career at Baruch College. *See Sid and George Santos 10-27-2020*, 77WABC, Oct. 27, 2020, *available at* https://wabcradio.com/episode/sid-and-george-santos-10-27-2020/ (last accessed Apr. 1, 2025) at 08:13-10:00. In another media interview from October 2020, Santos claimed that he had "put [him]self through college and got an MBA from NYU" with "zero debt." *See Police Off the Cuff After Hours #37 with Congressional Candidate George Santos*, POLICE OFF THE CUFF, Oct. 29, 2020, *available at* https://www.youtube.com/watch?v=P2IF5bUsksQ (last accessed Apr. 1, 2025) at 51:55-52:37. In an interview with CBS in 2020, Santos claimed: "When I first started in my career at Citigroup, I was told you're a really smart guy." *See Campaign of Deceit: The Election of George Santos*, CBS News, Feb. 9, 2023, *available at* https://www.youtube.com/watch?v=TnFh6SAP5sA (last accessed Apr. 1, 2025) at 4:26-4:47. And in a résumé Santos submitted to the Nassau County Republican Committee in January 2020, he claimed that, during his tenure as a Project Manager at Goldman Sachs, he doubled revenue growth from $300 million to $600 million.

So profuse were Santos's lies that they often evolved, changed, or contradicted one another over time, in particular with respect to his non-existent real estate holdings. To a campaign consultant and a campaign staffer, he claimed he was renovating a large home in Oyster Bay, New York. But to various campaign donors, he claimed he owned homes in, alternatively, Brookville, Westhampton, or Oyster Bay Cove. To other campaign donors, he claimed he was purchasing a multi-million-dollar home in Lloyd Harbor or Cold Spring Harbor. In February 2021, Santos posted to Twitter that he and his family owned 13 properties in New York State. *See @MrSantosNY*, TWITTER (Feb. 8, 2021, 10:31PM), *available at* https://x.com/MrSantosNY/status/1358981815495704581 (last accessed Apr. 1, 2025). In September 2021, he claimed in a text message to "own property up and down 34th Ave in Jackson Heights." Of course, none of this was true. His claims about the Devolder Organization were similarly nonsensical. In a text message sent to a former business associate on October 17, 2021, for example, Santos claimed that the Devolder Organization now had $35 million in assets under management. Yet later that same month, Santos's campaign website claimed that he "currently works at his family's firm, Devolder Organization, as a Managing Member where he oversees the asset allocations of 80MM AUM," *i.e.*, $80 million in assets under management. As previously discussed, neither of these figures was remotely accurate.

Perhaps even more alarming than the lies themselves is the degree to which Santos repeatedly doubled down on his fraudulent narrative when confronted—again, a testament to his likelihood of recidivism and abject lack of remorse. The government's investigation revealed that, during the 2022 election cycle, Santos's campaign commissioned a vulnerability study to identify Santos's susceptibility to attacks on the campaign trail. At the end of November 2021, the campaign received the results, which detailed various scandals and weaknesses associated with Santos's candidacy, including, but not limited to, the readily provable lies addressed above. When

confronted by senior campaign staff, Santos stunningly doubled down, claiming that the report had been wrong, attributing, for example, the researchers' inability to find records of his education history at the registrars' offices of Baruch College and NYU Stern to confusion about his surname. As a result, senior members of his campaign resigned in protest on December 10, 2021, after learning that Santos would not withdraw as a candidate. Even more concerning is the timing. As detailed above, just days after senior members of his campaign resigned after the vulnerability study, Santos conspired with Marks to submit fraudulent fundraising reports to the FEC. In December 2021, Santos stole Individual 3's credit card information and began charging her credit card for his personal benefit. Put plainly, Santos's response to being confronted with his lies and fraud was not to cease his deceptions but to lean into them, press onward, and even escalate. This conduct bespeaks a defendant who resists accountability, rationalizes his conduct, and poses a significant future danger to the community.

Despite the vulnerability report having identified his biographical misrepresentations in November 2021, Santos emailed his campaign to confirm the accuracy of a fraudulent candidate biography in January 2022, one that maintained he attended Baruch College and NYU Stern and worked at Citigroup and Goldman Sachs. The government's investigation even revealed that, in approximately August 2022, after being repeatedly pressed by campaign staff to confirm his graduation from Baruch College, Santos solicited a third-party vendor to create a forged Baruch College diploma.

When the New York Times began investigating Santos's background in December 2022, Santos again refused to acknowledge his blatant falsehoods.[17] In an email to a campaign consultant on December 14, 2022, for example, sent after the consultant had been contacted by New York Times reporters, Santos stated the following: "NYU was a certificate not a degree. Baruch was a BA degree. Employment all checks out. Citi. MetGlobal. Goldman. LinkBridge. And we did not list Harbor City Capital for obvious reasons." The "obvious reason," of course, is that Harbor City—one of the only places where Santos had actually, in truth, been previously employed, had recently been accused of operating a multi-million-dollar Ponzi scheme by the SEC. Following the publication of the article, Santos told campaign staff and associates that the article's allegations were false and that he planned to sue the New York Times.

As many of the allegations in the New York Times article were independently verified, Santos began crafting new lies to justify or cover up his prior ones. At the end of February 2023, for example, Santos participated in a media interview with Piers Morgan, during which Morgan confronted Santos with the fact that his résumé falsely stated that he graduated from NYU Stern with an MBA. In response, Santos acknowledged that he had not received an MBA from NYU Stern, but claimed that he did not create the résumé, that nobody associated with Santos supplied the résumé, that the résumé had come from the Republican Party—Santos claimed he was

---

[17]    *See* Grace Ashford and Michael Gold, *Who is Rep.-Elect George Santos? His Résumé May Be Largely Fiction*, N.Y. TIMES, Dec. 19, 2022, available at https://www.nytimes.com/2022/12/19/nyregion/george-santos-ny-republicans.html (last accessed Mar. 7, 2025).

"still trying to understand where that came from."  *See "I've Been a Terrible Liar" – Piers Morgan GRILLS George Santos – Full Interview*, Piers Morgan Uncensored, Feb. 20, 2023, *available at* https://www.youtube.com/watch?v=I7p-6HHUgl4 (last accessed Apr. 1, 2025), at 8:55-9:41.  In fact, however, the government's investigation revealed that Santos personally supplied the résumé containing these false claims to the Nassau County Republican Committee.  He simply was unwilling—in the face of overwhelming evidence—to accept responsibility.

As time passed, media scrutiny turned to Santos's Financial Disclosure Reports filed with the U.S. House of Representatives, which, as previously discussed, contained numerous material false statements made by Santos.  In various media interviews, Santos spun new lies to explain away the readily apparent inconsistencies in those documents.  In one media interview in April 2023, for example, Santos delivered a false explanation for why his reported income amounted to only $55,000 from LinkBridge Investors in the report he filed on May 11, 2020, claiming that his income had been "slashed severely" in 2020 due to the COVID-19 pandemic. *See Macrodosing Sits Down With Expelled Congressman George Santos*, MACRODOSING W/ PFT & ARIAN FOSTER, Apr. 18, 2023, *available at* https://www.youtube.com/watch?v=TKw-qnBPCs4 (last accessed Apr. 1, 2025) at 1:10:28-1:11:52.  Around the same time, Santos was repeating this same explanation in other venues.  For example, in early 2023, Santos told a documentary filmmaker that his Financial Disclosure Statement filed on May 11, 2020, reflected an income of only $55,000 from LinkBridge Investors for the following reason:

> We struck a deal with a company so nobody went unemployed and got reduced to like a very basic salary.  As we called it 'livable wages' in the company, so we could get by.  Because our industry was capital introduction via vis-à-vis conferences, vis-à-vis speed dating, all that in private equity, and managing limited-partner, general-partner relationships in investment groups.  So, long story short, I went from 2019 bringing in 400-and-something thousand dollars, to yeah, in 2020 my reported income was 55k.  Couldn't be more legitimate.

*Hear George Santos on Indicted Money Scheme and His Joke About 'Jews,'* MSNBC, May 10, 2023, *available at* https://www.msnbc.com/the-beat-with-ari/watch/hear-george-santos-on-indicted-money-scheme-and-his-joke-about-jews%20-exclusive-audio-173897797563 (last accessed Apr. 1, 2025).

Santos was lying to cover up earlier lies.  His income in 2019 was not "400-and-something thousand dollars," but $27,555.  His employer in 2019, LinkBridge Investors, did not reduce his income to a "very basic salary" "so nobody went unemployed" during the COVID-19 pandemic.  In reality, Santos left LinkBridge Investors at the end of 2019 and joined Harbor City at the beginning of 2020, prior to the onset of the COVID-19 pandemic, and his salary from Harbor City was never reduced as a result of the COVID-19 pandemic (notwithstanding his decision to fraudulently apply for unemployment insurance).

Moreover, as alluded to *supra*, Santos's behavior since being indicted in the instant matter has been nothing short of outrageous. He has continued to hunt for the limelight, lied in interviews with national media outlets about these proceedings, and attempted to parlay his infamy into a career as a media personality. For example, following his arraignment in this matter on May 10, 2023, Santos held an impromptu press conference on the courthouse steps, decried the instant prosecution as a "witch hunt" that "has been an experience . . . for a book." *George Santos News Conference After Court Appearance*, CBS New York, May 10, 2023, *available at* https://www.youtube.com/ watch?v=PcfmU8fayLI&t=1230s (last accessed Apr. 1, 2025) at 5:10-11:24. Over the course of many ensuing months, Santos went on a media blitz, during which he repeatedly spread false exculpatory explanations for his charged criminal conduct. In an interview with CNN on November 5, 2023, for example, Santos claimed he was never involved in campaign filings with the FEC, that he did, in fact, make the $500,000 loan to his campaign reported in his campaign filing with the FEC for the first quarter of 2022, that Nancy Marks had lied in her allocution to this Court when she pled guilty, and that he never handled donor credit card information, among other things. *See CNN Reporter Confronts George Santos About His Lies*, CNN, Nov. 5, 2023, *available at* https://www.youtube.com/watch?v=sdfaG6QY9pM (last accessed Apr. 1, 2025) at 2:58-8:32. All of these public-facing statements, which Santos breathlessly repeated while under indictment, have now been exposed as false by his admission of guilt just three weeks before trial. Given Santos's persistent and antagonistic efforts to disclaim any responsibility in this case—simply ignoring the individual victims of his crimes—the Court should approach with extreme skepticism any effort by Santos at this late juncture, when facing down a lengthy prison sentence, to claim that he accepts responsibility for his actions.[18]

Critically, *none of the aforementioned history and characteristics of this defendant are captured in the Guidelines calculation above, and thus are not reflected in the advisory Guidelines range*. For that reason, the government urges the Court to impose a sentence at the top of that range, namely 87 months of incarceration.

---

[18] Even at this late juncture, Santos has repeatedly attempted to shift blame onto others. For example, during his most recent appearance on his podcast, Santos had this to say when he was asked if he had any regrets about his criminal conduct: "I just regret, I always say this to people, I regret aligning myself with certain people that . . . . I should have known better. Um, I didn't know then, because I'm a newbie to politics. Right? I was a newbie to politics. But I should have known better. Like, there were enough signs that I think I should have been like, yeah, I don't know if I should continue having professional relationships with this person. But I ignored all of that in the sign of ambition. I'm like, 'Oh, it's too hard to go find good help, so this is the available help immediately. I'm just gonna stick to it.' And that's what I did. And that I regret deeply and dearly." *See Does George Santos Have Regrets? Former Politician Grilled by Perez Hilton on Prison, Trump + More!*, PEREZ HILTON, Apr. 1, 2025, *available at* https://www.youtube.com/watch?v=1Zy4rUULNs8 (last accessed Apr. 3, 2025). Santos takes *no* responsibility for *his* actions, falsely portraying himself as a victim of misplaced trust in others. That characterization could not be farther from the truth.

3.  <u>A Significant Sentence is Needed to Provide Adequate Specific and General Deterrence</u>

The need for Santos's sentence to provide adequate deterrence is self-evident. Santos has repeatedly demonstrated his inability to exert self-control or otherwise be meaningfully deterred from engaging in repeated fraud and deception.  As outlined above, Santos has lied, deceived, and defrauded for years.  He has stolen from the very people who trusted him and sought to help him the most.  When others confronted him with suspicions of deceit—whether campaign consultants reviewing a vulnerability report, campaign staffers reconciling bank statements and false FEC filings, or national media figures presenting his own words back to him—Santos, without fail, has doubled down, disclaiming any wrongdoing and creating new deceptions to cover up past dishonesty.  From claiming that researchers could not find evidence of his graduation from Baruch College due to a surname mix-up to claiming a bank had failed to process his wire requests to asserting that he was not the author of his own résumé, Santos's dishonesty and base self-preservation know no bounds.  It is abundantly clear that, without a substantial deterrent, Santos will continue to deceive and defraud for years to come.

That is especially true given Santos's craven efforts to leverage his lawbreaking as a springboard to celebrity and riches.  At the outset of this case, while still on the courthouse steps, Santos publicly mused about his criminal prosecution presenting an opportunity for a book deal. Days after he was expelled from the U.S. House of Representatives, Santos joined Cameo, the celebrity video-sharing platform, to monetize his criminal charges, from which he has earned more than \$350,000.[19]  *See* Virginia Chamlee, *George Santos Launches a Cameo Page Days After Historic Expulsion from Congress*, PEOPLE MAGAZINE, Dec. 4, 2023, *available at* https://people.com/george-santos-launches-cameo-page-after-expulsion-8410491 (last accessed Apr. 1, 2025).  Santos also contracted with a documentary filmmaker, for which he has already been paid at least \$200,000.[20]  *See* Grace Ashford, *Coming Soon: A George Santos Documentary Focusing on His 'Human Side'*, N.Y. TIMES, Dec. 21, 2023, *available at* https://www.nytimes.com/2023/12/21/nyregion/george-santos-documentary-fyre.html (last accessed Apr. 1, 2025).  Despite these earnings, as noted above, Santos has forfeited nothing and has not repaid any of his victims.

--------------------------------------------------

[19]    Santos represented to the Probation Department that he has earned approximately \$400,000 during the first month of his career on Cameo and now receives \$5,000 per month on average.  (PSR ¶ 140).  Yet he represented in a financial statement to the government that his lifetime earnings from Cameo are only \$358,256.  Clearly, he is lying to someone.  To date, Santos has not supplied either the government or the Probation Department with the supporting financial records that would reconcile this discrepancy.

[20]    Santos represented to the Probation Department that he was paid \$250,000 up-front for the documentary, while he represented in a financial statement to the government that the payment had only been \$200,000.  (PSR ¶ 140).  Once again, as of this writing, Santos has not provided the supporting financial records to reconcile this discrepancy.

As the Court is well aware from Santos's efforts to postpone his sentencing, Santos has also recently launched his weekly podcast named "Pants on Fire with George Santos," a perfect crystallization of his lack of genuine contrition and his tone-deaf efforts to continue turning lies into dollars. Under these circumstances, it hardly requires repeating that a significant prison sentence is needed here to provide adequate deterrence as much to Santos as to other would-be fraudsters tempted to use criminal conduct as a shortcut to fame, fortune, and abuse of our electoral system.

### 4. A Significant Prison Sentence is Needed to Protect the Public

A significant prison sentence is also needed to protect the public from being defrauded by Santos again. Over the course of many years, Santos has returned to a criminal lifestyle. He has stolen hundreds of thousands of dollars; he has defrauded the elderly and impaired; he has victimized donors, political committees, government agencies. The lower chamber of Congress that he desperately sought to occupy as a United States Representative from New York has suffered distraction and scandal due to his misconduct. Even when confronted with his lies and fraud, Santos continued to recidivate and escalate, his criminality growing bolder and more audacious over time. The risk of recidivism here is significant and obvious, tempered only by the comfort that Santos has been so thoroughly exposed as a liar and fraudster that there are few who will be easily deceived by him again. But the risk remains. Notably, in Santos's telling, despite swindling numerous victims of nearly $400,000, he is in no position to pay these monies back anytime soon, meaning these victims will suffer lasting harm. Only a significant prison sentence will incapacitate Santos from adding new victims to the list of people and entities that are poorer and worse off for having come into contact with him.

### 5. The Court Should Order Restitution and Forfeiture in the Stipulated Amounts

As part of his plea agreement, Santos has consented to the entry of a forfeiture money judgment in the amount of $205,002.97. On December 19, 2024, the Court entered a preliminary Order of Forfeiture to that effect. *See* ECF No. 107. The government respectfully requests that, at the sentencing proceeding on April 25, 2025, the Court orally pronounce the entry of forfeiture as part of the sentence imposed and attach a copy of the Order of Forfeiture to the Judgment following sentencing.

In addition, as part of his plea agreement, Santos has agreed to pay a total amount of $373,749.97 in restitution accordance with an order to be filed under seal with the Court to the numerous victims of his criminal schemes. In advance of sentencing, the government will file under seal with the Court a proposed Order of Restitution to that effect. The government respectfully requests that, at the sentencing proceeding on April 25, 2025, the Court orally pronounce the entry of restitution as part of the sentence imposed and attach a sealed copy of the Order of Restitution to the judgment following sentencing.

IV.    <u>Conclusion</u>

        Based on the foregoing, the government respectfully requests that an 87-month sentence is reasonable and appropriate in this case.

                                  Respectfully submitted,

                                  JOHN J. DURHAM
                                  United States Attorney

By:       /s/
                Ryan C. Harris
                Anthony Bagnuola
                Laura Zuckerwise
                Assistant U.S. Attorneys

                John P. Taddei
                Senior Litigation Counsel

cc:    Clerk of the Court (JS) (by ECF)
       Counsel of Record (by ECF)